The **BARNES FOUNDATION**, Plaintiff,

v.

The **TOWNSHIP OF LOWER MERION**, the Lower Merion Board of Commissioners, Gloria P. Wolek, Frank Lutz, Kenneth E. Davis, Phyllis L. Zemble, Ora R. Pierce, James J. Prendergast, Alan C. Kessler, Brian D. Rosenthal, Joseph M. Manko, Howard L. West, W. Bruce McConnel III, James S. Ettelson, David A. Sonenshein, Regene H. Silver, Defendants.

No. CIV.A. 96–0372.

United States District Court, E.D. Pennsylvania.

Sept. 26, 1997.

Paul R. Rosen, Larry R. Wood, Jr., Philadelphia, PA, for the Commissioners of the Township of Lower Merion.

Robert J. Sugarman, Philadelphia, PA, for Barnes Foundation.

Paul S. Diamond, Willaim K. Pelosi, Mathieu J. Shapiro, Philadelphia, PA, for the Township of Lower Merion.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

### TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .975

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .979

I. STANDARD FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .981

II. 42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .982
 A. EQUAL PROTECTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .982
 1. Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .982
 2. The Barnes's Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .985
 a. The Defendants' Reaction to the Barnes's November 9,
 1995Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .987
 b. Picketing at the Reopening Gala Events . . . . . . . . . . . . . . . . . . . . . .988
 c. The Comments of Residential Neighbor Robert Marmon at
 theCommissioners' Public Meeting Held on November 15,
 1995 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .989
 d. The Township's Relations with Residents in Ardmore . . . . . . . . . . .990
 e. Comments About Discrimination in Ardmore . . . . . . . . . . . . . . . . . .995
 i. Commissioner Manko's Alleged Statement . . . . . . . . . . . . . . . . . .995
 ii. Ann Hutchinson's Memo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .998
 f. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .999
 B. DUE PROCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .999
 C. FIRST AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1002

III. 42 U.S.C. § 1985(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1004

IV. 42 U.S.C. § 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1005

CONCLUSION .................................................1005

APPENDIX ....................................................1005
 a. *The Barnes's On-Site Parking Lot* ..........................1006
 i. *Off–Site Parking Plan* .................................1006
 ii. *Zoning Hearing Board Approval of the Barnes's On–Site Parking Lot* .........................................1007
 b. *The Final Stages of Renovations in Autumn 1995* ........1009
 i. *Building Inspections* .................................1009
 ii. *The Stop Work Order* .................................1010
 iii. *Final Inspections and Panic Hardware* ...............1010
 iv. *The Barnes's Temporary Tent* .........................1013
 c. *November 1995: The Reopening Gala Events the November 15 Commissioners' Meeting, and Temporary Parking Permission* .............1013
 i. *Township Manager Latshaw's November 9, 1995 Letter* ..............1013
 ii. *The November 9, 1995 Meeting* .......................1015
 iii. *Traffic Plans for the Reopening Gala Events* ........1016
 iv. *The November 15, 1995 Commissioners' Meeting and the Resolution* ......................................1016
 v. *The November 30, 1995 Meeting* ......................1017
 vi. *Temporary Parking Permission* .......................1017
 d. *The December 1995 and August 1996 Zoning Citations* ..................1018

## INTRODUCTION

Plaintiff the Barnes Foundation (the "Barnes") brought this action against Defendants the Township of Lower Merion (the "Township"), the Lower Merion Board of Commissioners, Gloria P. Wolek, Frank Lutz, Kenneth E. Davis, Phyllis L. Zemble, Ora R. Pierce, James J. Prendergast, Alan C. Kessler, Brian D. Rosenthal, Joseph M. Manko, Howard L. West, W. Bruce McConnel III, James S. Ettelson, and David A. Sonenshein (the "Commissioners") under 42 U.S.C. §§ 1983 and 1985(3) for violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution. The crux of the Barnes's claim is that the Township and its Board of Commissioners enforced zoning, parking, police, and fire code regulations in a discriminatory manner against the Barnes because of their racial bias toward three of its Trustees who are African American. The Township and the Commissioners (collectively the "Defendants") now move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure because they assert that the Barnes does not have any evidence to present at trial that would show that they discriminated against it.[1]

My inquiry in deciding the Defendants' motions for summary judgment is a narrow one. I am not being called upon to decide the truth of either side's story or to determine what the facts are, for those are the functions of the jury. Rather, under the Federal Rules of Civil Procedure, my task in deciding these motions for summary judgment is to focus solely on the evidence supporting the Barnes's case and to determine whether it is sufficient to require a trial. This task requires me to resolve two questions, the first being whether the evidence supporting the Barnes's case would be admissible at trial under the Federal Rules of Evidence, and the second being whether, assuming that all of the Barnes's admissible evidence were true, that evidence would be legally sufficient to allow a jury to conclude that the Defendants had deprived the Barnes of its rights under either the Equal Protection Clause or the Due Process Clause of the Fourteenth Amendment. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the evidence supporting the Barnes's case were insufficient to allow a jury to make that conclusion, a trial would be unnecessary and the Defendants would be entitled to summary judgment.

After a careful examination of the evidence supporting the Barnes's case, I have concluded that the Barnes has not met its burden

---

1. The Barnes also moves for summary judgment under Rule 56 on the Defendants' joint Counter- claim for abuse of process. The Barnes's motion will be addressed subsequently in another order.

here. As stated before, the Barnes is claiming violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution.[2] The law is clear as to what the Barnes would have to prove at trial. Under well-settled Supreme Court doctrine, in order to show that the Township and the Commissioners violated the Equal Protection Clause when they applied their zoning, parking, police, and fire code regulations to the Barnes—regulations that on their face apply to all citizens regardless of race—the Barnes would have to show that the Township and Commissioners in fact applied these facially neutral regulations on the basis of race. *See Washington v. Davis*, 426 U.S. 229, 239–42, 96 S.Ct. 2040, 2047–49, 48 L.Ed.2d 597 (1976); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977); *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1886). In order to show that the Defendants applied these regulations on the basis of race, the Barnes would have to show, first, that the Defendants treated it differently than similarly situated institutions, and second, that they did so with the deliberate purpose or intent to discriminate against the Barnes because of the race of its Trustees. *See Washington v. Davis*, 426 U.S. at 239–42, 96 S.Ct. at 2047–49; *Arlington Heights*, 429 U.S. at 265, 97 S.Ct. at 563; *Personnel Adm'r v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292–93, 60 L.Ed.2d 870 (1979). Furthermore, in order to show that the Defendants acted with the deliberate purpose to discriminate on the basis of race, the Barnes would have to show that the Defendants "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,'" the adverse effects it would have on institutions governed by African Americans, including the Barnes. *See Personnel Adm'r v. Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296. Thus, in order to meet its burden under the Federal Rules of Civil Procedure to avoid summary judgment, the

Barnes would have to show that it could produce admissible evidence at trial sufficient to allow the jury to conclude that the Defendants purposefully singled it out for differential treatment because three of its Trustees are African American.

The Barnes's burden under the Due Process Clause is similar to its burden under the Equal Protection Clause. In order to show that the Defendants violated the Due Process Clause when they applied their zoning, parking, police, and fire code regulations to the Barnes, the Barnes would have to show that the Defendants did not act in furtherance of any legitimate governmental purpose, but rather that they deliberately abused their power to discriminate against the Barnes because of the race of its Trustees. *See Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667, 683 (3d Cir.1991). Thus, as with the Equal Protection Clause, in order to avoid summary judgment, the Barnes would have to show that it could produce admissible evidence at trial sufficient to allow a jury to conclude that the Defendants undertook the actions they did toward the Barnes with a racially discriminatory purpose.

The admissible evidence supporting the Barnes's case fails to show that any of the Defendants' conduct was motivated by a racially discriminatory purpose. The vast majority of the Barnes's evidence has nothing to do with race, but rather only details various aspects of an ordinary zoning dispute, such as the fact that the Defendants required the Barnes to obtain approval for a proposed on-site parking lot from the Township's Zoning Hearing Board or that the Barnes was cited for violating the Zoning Ordinance by changing its primary use from an educational institution to a museum.

Moreover, what little evidence there is in the record that is even remotely related to race fails to show that any of the Defendants acted with a racially discriminatory purpose toward the Barnes. The most direct evidence the Barnes offers is that during a

---

**2.** The Barnes also raises claims under the First Amendment and 42 U.S.C. § 1981, but as discussed below, these claims, like the Equal Protection and Due Process claims, depend upon a

showing of improper motivation, and the Barnes has not produced evidence sufficient to show that any of the Defendants' conduct was improperly motivated.

period of public comment in a meeting of the Township's Board of Commissioners held in November 1995, in which nearly a dozen neighborhood residents spoke at some length, one of the speakers, who is not a defendant here, compared the President of the Barnes to a "carpetbagger." Whatever this statement may reveal about the speaker's own motivations, it does not show that the Defendants themselves were racially motivated in any of the actions they undertook.

The Barnes also offers a hearsay statement that one of the Defendant Commissioners commented to a newspaper reporter that at some point during his eighteen years of service on the Township's Board of Commissioners, other board members had said "Let's stick it to Ardmore because there are black people there." Even if the Barnes could overcome the hearsay objections, which it cannot, the Barnes has not demonstrated any nexus whatsoever between this statement, taking it to be true as I must for this motion, and its allegations that the Defendants treated the Barnes differently because of the race of its Trustees. Nor has the Barnes demonstrated any nexus whatsoever between any of the other evidence that it presents, also taking it to be true as I must on a motion for summary judgment, and its allegations that the Defendants treated the Barnes differently because of race.

Thus, the Barnes has not shown that it would be able to produce admissible evidence at trial sufficient to allow a jury to conclude that the Defendants undertook any of the actions they did with a racially discriminatory purpose, which is a necessary element of the Barnes's case under both the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Accordingly, as explained in greater detail below, a trial is unnecessary, and I will grant the Township's and the Commissioners' motions for summary judgment.

## BACKGROUND

The Barnes Foundation is a corporation organized under the laws of Pennsylvania, with real estate located in the Township of Lower Merion, Pennsylvania, at 300 North Latches Lane. It was created in 1922 by Dr. Albert C. Barnes, who conveyed to the Foundation by an Indenture and Agreement both the real estate that it currently occupies and the extensive art collection that Dr. Barnes had acquired. Dr. Barnes provided in the Indenture that the purpose of the Foundation was "to promote the advancement of education and the appreciation of the fine arts."

The Barnes Foundation is governed by a Board of Trustees. During the time period relevant to this action, the Barnes was governed by four Trustees—Richard H. Glanton, Esquire, who is the elected President of the Board of Trustees, Niara Sudarkasa, Shirley A. Jackson, and Charles Frank. With the exception of Frank, all of the Barnes's Trustees are African American.

The Township of Lower Merion is a municipal corporation and a First Class Township, located adjacent to the City of Philadelphia. The Township is governed by an elected Board of Commissioners. During the time period relevant to this action, the Township was governed by fourteen Commissioners, who are all Defendants in this action.

The current dispute stems from the operation and use of the Barnes's art gallery. By entry of a consent decree in 1960 between the Commonwealth of Pennsylvania and the Barnes, the Barnes's art gallery was opened up for admission to the public two days per week, except during the months of July and August of each year. The art gallery was subsequently opened up to the public for an additional half-day per week following the death of Dr. Barnes's wife. In 1993, the Foundation was closed to the public for the purpose of renovating the facility and the art gallery. The Foundation was reopened to the public approximately nineteen months later, in November 1995. It is the events surrounding this reopening that provide the source of controversy for this lawsuit.

The Barnes filed a complaint in this Court on January 18, 1996 and an amended complaint on March 7, 1996, in which it alleged that the Township, the Commissioners, and seventeen of the Barnes's residential neighbors generally deprived it and conspired to deprive it of its rights under the Equal Pro-

tection and Due Process Clauses of the Fourteenth Amendment. The Barnes alleged that as it was preparing to reopen the Foundation to the public in the fall of 1995, the Defendants applied their zoning, parking, police, and fire code regulations in a discriminatory manner against the Barnes because of the race of three of its Trustees. In particular, the Barnes alleged that the Defendants harassed the Barnes and its guests during its reopening celebratory events, that they required the Barnes to obtain approval for an on-site parking lot from the Township's Zoning Hearing Board, and that they issued a zoning citation to the Barnes. In its amended complaint, the Barnes also alleged that the Township and Commissioners brought a defamation action against the Trustees of the Barnes to retaliate against the Barnes for filing the instant action.

On June 3, 1996, I denied the motions to dismiss filed by the Township and the Commissioners. By the same order, I granted the collective motion to dismiss filed by the seventeen Defendant neighbors on grounds of First Amendment immunity under the *Noerr–Pennington* doctrine. I also refused to abstain from adjudicating this matter under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

On June 18, 1996, the Township and the Commissioners filed a joint Counterclaim for the tort of abuse of process. On December 30, 1996, I denied the Barnes's motion to dismiss the Defendants' counterclaim. On February 7, 1997, I denied the Barnes's motions to amend its first amended complaint, with the exception of adding Commissioners Rocco Burdo and Louis Gould as Defendants to the extent that they would be subject in their official capacities to any prospective equitable relief that might be subsequently granted in this action. By a separate order on February 7, 1997, I granted the parties' joint request for an extension of the discovery deadline until April 7, 1997, at which time discovery in this action was completed.

On April 23, 1997, the Township and the Commissioners both filed motions for summary judgment.[3] They also submitted a joint Statement of Undisputed Facts and a joint Appendix containing six large boxes of exhibits.[4] On May 7, 1997, I denied the Barnes's motion to defer ruling on the Defendants' motions for summary judgment pending further discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.[5] On May 13, 1997, the Barnes filed a memorandum of law in opposition to the Defendants' motions for summary judgment, and on May 15, 1997, the Barnes submitted a Statement of Material Facts Supported by Substantial Evidence. The Barnes also filed a large box of exhibits.[6]

Finally, on June 6, 1997, the Township and the Commissioners each filed a separate reply to the Barnes's response, and the Township also submitted an additional large box worth of exhibits.[7] On July 3, 1997, I denied the Barnes's motion for leave to file a surre-

---

**3.** The Barnes also moved for summary judgment on April 23, 1997 with respect to the Defendants' counterclaim. This motion will be addressed subsequently in another order.

**4.** Throughout this memorandum, I will refer to the Township's motion as "Doc. # 288," the Commissioners' motion as "Doc. # 291," the Township's Statement of Undisputed Facts as "Doc. # 289," and the Commissioners' Joinder in the Township's Statement of Undisputed Facts as "Doc. # 290," which each reflect the civil docket number of the referenced document. Likewise, I will refer to particular documents in the Defendants' joint Appendix by the exhibit numbers supplied by the Township. Thus, for example, I would refer to page 416 of Commissioner James Ettelson's deposition as "Defs.' Ex. 16.2, at 416."

**5.** The Barnes again requested additional discovery under Rule 56(f) in various portions of the response it filed to the Defendants' motions for summary judgment, (Doc. # 323, at 56; SMF, ¶ 185), but the Barnes did not attach an affidavit to its response in support of this request, as required by Rule 56(f), and in any case, my prior ruling stands.

**6.** Throughout this memorandum, I will refer to the Barnes's memorandum of law as "Doc. # 323" and its Statement of Material Facts as "SMF." Likewise, I will refer to the Barnes's exhibits by the numbers supplied by the Barnes, so that, for example, a reference to paragraph 2 of Peter Kelsen's affidavit would be cited as "Pl.'s Ex. 11, ¶ 2."

**7.** I will refer to the Township's Reply as "Doc. # 342" and the Commissioners' Reply as "Doc. # 343."

ply. The record is complete, and I am now ready to turn to a discussion of the materials the parties submitted in support of and in opposition to the Defendants' motions for summary judgment.

## DISCUSSION

### I. STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. at 2553. When the moving party does not bear the burden of persuasion at trial, as is the case here, its burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554.

Once the moving party has filed a properly supported motion, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmoving party "may not rest upon the mere allegations or denials of the [nonmoving] party's pleading," *id.,* but must support its response

with affidavits, depositions, answers to interrogatories, or admissions on file. *See Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990).

Although the evidence presented on a motion for summary judgment does not have to be in admissible form, *see Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553, Rule 56(e) requires the presentation of evidence "as would be admissible" at trial, *see* Fed.R.Civ.P. 56(e), and thus the evidence must be "reduc[ible] to admissible evidence" at trial, *see Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555. *See, e.g., J.F. Feeser, Inc. v. Serv-A-Portion, Inc.,* 909 F.2d 1524, 1542 (3d Cir.1990); *Williams v. Borough of West Chester,* 891 F.2d 458, 466 n. 12 (3d Cir.1989) (Becker, J., opinion announcing the judgment of the court). Affidavits presented in support of and in opposition to a motion for summary judgment must "be made on personal knowledge," must "set forth such facts as would be admissible in evidence," and must "show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e); *Hlinka v. Bethlehem Steel Corp.,* 863 F.2d 279, 282 (3d Cir.1988); *Maldonado v. Ramirez,* 757 F.2d 48, 50 (3d Cir.1985). *See generally* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 486–95 (2d ed. 1983 & Supp.1997).

To determine whether summary judgment is appropriate, I must determine whether any genuine issue of material fact exists. An issue is "material" only if the dispute "might affect the outcome of the suit under the governing law." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See id.* The standard thus "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)." *Id.* at 250, 106 S.Ct. at 2511. If the evidence favoring the nonmoving party is "merely colorable," "not significantly probative," or amounts to only a "scintilla," summary judgment may be granted. *See id.,* at 249–50, 252, 106 S.Ct. at 2509–10, 2512; *see*

also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)). Of course, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513; *see also Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992). Moreover, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513; *see also Big Apple BMW, Inc.,* 974 F.2d at 1363. Thus, my inquiry at the summary judgment stage is only the "threshold inquiry of determining whether there is the need for a trial," that is, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 250–52, 106 S.Ct. at 2511–12.

Although courts have sometimes expressed reluctance to grant motions for summary judgment in cases revolving around issues of intent, *see, e.g., National Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 205 (2d Cir.1989), they have nonetheless recognized their duty to grant summary judgment when the opposing party fails to proffer evidence sufficient to survive a motion for judgment as a matter of law at trial. *See, e.g., Medina–Munoz v. R.J. Reynolds Tobacco,* 896 F.2d 5, 8 (1st Cir.1990) ("Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.").

As the Supreme Court explained in *Celotex,* the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"

*Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1). Furthermore, "[r]ule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id.*

## II. 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. ...

42 U.S.C.A. § 1983 (West Supp.1997). In order to bring a successful § 1983 claim, a plaintiff must demonstrate (1) that the challenged conduct was committed by a person acting under color of state law, and (2) that the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or federal law. *See Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981); *Piecknick v. Pennsylvania,* 36 F.3d 1250, 1255–56 (3d Cir.1994); *Carter v. City of Phila.,* 989 F.2d 117, 119 (3d Cir.1993).

The Township and Commissioners do not contest that the challenged actions were taken under color of state law. They do contest the Barnes's claim that the challenged actions deprived the Barnes of its rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment. I will discuss these asserted deprivations in turn below.

### A. EQUAL PROTECTION

#### 1. *Legal Standard*

The Equal Protection Clause of the Fourteenth Amendment of the United States Con-

stitution provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause announces the "fundamental principle" that "the State must govern impartially," *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 587, 99 S.Ct. 1355, 1367, 59 L.Ed.2d 587 (1979), and "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).

■■■ State governments generally possess the initial discretion to determine what in fact "is 'different' and what is the 'same,'" and enjoy "substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill." *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). In most areas of social and economic regulation, the Equal Protection Clause requires "only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose," *id.,* and "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes," *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. Thus, the "general rule" is that state legislation or other official action "is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.; see also Federal Communications Comm'n v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993) ("In areas of social or economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.").

■■■ This general rule "gives way, however, when a statute classifies by race, alienage, or national origin." *Cleburne,* 473 U.S. at

440, 105 S.Ct. at 3254. These factors "are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy." *Id.; see also Plyler v. Doe,* 457 U.S. at 216 n. 14, 102 S.Ct. at 2394 n. 14 (explaining that "suspect" classifications "are more likely than others to reflect deep-seated prejudice" and "tend to be irrelevant to any proper legislative goal"). Both "[f]or these reasons and because such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254.

■■■ When official action taken pursuant to a facially neutral law is challenged under the Equal Protection Clause, rational basis scrutiny will apply unless the plaintiff can show that the law was enacted as a proxy for race or was applied on the basis of race, which would then trigger strict scrutiny. To show that the law was enacted or applied on the basis of race, the plaintiff must show that the defendant acted with the purpose or intent to discriminate on the basis of race. *See Washington v. Davis,* 426 U.S. 229, 239–42, 96 S.Ct. 2040, 2047–49, 48 L.Ed.2d 597 (1976); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Personnel Adm'r v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292–93, 60 L.Ed.2d 870 (1979). The United States Supreme Court in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), rejected the notion that official action could violate the Equal Protection Clause simply by virtue of its racially disproportionate impact, and it instead made clear the "basic equal protection principle" that "the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." *See id.* at 240, 96 S.Ct. at 2048. Thus, the *Washington v. Davis* Court upheld a police department's adoption of a job-related employment test, despite generally higher failure rates experienced by African American applicants, because the plaintiffs had not demonstrated that the defendants adopted

the test as a "purposeful device to discriminate" against African American applicants. *See id.* at 246, 96 S.Ct. at 2051.

The Supreme Court further clarified the meaning of discriminatory "intent" or "purpose" in *Personnel Adm'r v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), a case in which the plaintiff challenged a preferential hiring policy for Massachusetts civil service positions that favored veterans over nonveterans. The plaintiff in *Feeney* contended that even if the hiring policy had not been enacted with the purposeful desire to disadvantage women, the legislature had still acted with the requisite discriminatory intent for purposes of the Equal Protection Clause because the legislature was aware of the inevitable disproportionate impact the hiring policy would have on women, given that the overwhelming number of veterans in Massachusetts were men. *See id.* at 278, 99 S.Ct. at 2295–96. The Supreme Court rejected this argument. The Court acknowledged that the law often employs a presumption that a person intends all of the natural and foreseeable consequences of his voluntary actions, but it concluded that "discriminatory purpose" for purposes of the Equal Protection Clause "implies more than intent as volition or intent as awareness of consequences." *Id.* at 278–79, 99 S.Ct. at 2296. Rather, "discriminatory purpose" "implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 279, 99 S.Ct. at 2296; *accord McCleskey v. Kemp,* 481 U.S. 279, 298, 107 S.Ct. 1756, 1770, 95 L.Ed.2d 262 (1987). Applying this higher standard of intent, the Court found no evidence in the record before it of any purpose to discriminate on the basis of sex, and thus the Court upheld Massachusetts's veterans' hiring preference against the plaintiff's Equal Protection challenge. *See Feeney,* 442 U.S. at 279–80, 99 S.Ct. at 2296–97.

The Supreme Court thus made clear in *Washington v. Davis* and *Personnel Adm'r v.*

*Feeney* that in order to establish an Equal Protection violation, a plaintiff must prove that the defendant undertook the challenged action with a racially discriminatory purpose, which requires proof that the defendant acted at least in part *because of* the plaintiff's race. In *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Supreme Court described the methods of proof by which a plaintiff can prove this requisite discriminatory purpose for an Equal Protection challenge to the application of a facially neutral law.

The Court began its discussion of proof in *Arlington Heights* by stating that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *See id.* at 266, 97 S.Ct. at 564. The Court observed that the "impact of the official action ... may provide an important starting point." *Id.* As the Court had explained earlier in *Washington v. Davis,* discriminatory purpose "may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *See Washington v. Davis,* 426 U.S. at 242, 96 S.Ct. at 2048–49. The Court made clear in its statements in *Arlington Heights,* however, that when the challenged action can be explained on grounds other than race, then proof of "impact alone is not determinative," and the plaintiff must adduce additional direct or circumstantial evidence from which a discriminatory purpose can be inferred. *See Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 564.

Evidence that could potentially demonstrate a discriminatory purpose includes the "historical background of the decision ..., particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 267, 97 S.Ct. at 564. Also, the "specific sequence of events leading up to the challenged decision ... may shed some light on the decisionmaker's purposes."[8] *Id.* Fur-

---

8. The Court offered as an example of such a "specific sequence of events" the hypothetical scenario in which a township suddenly changed

the long-standing zoning status of a community from a multiple-family designation to a single-family designation upon learning of a developer's

thermore, "[d]epartures from the normal procedural sequence ... might afford evidence that improper purposes are playing a role," and "[s]ubstantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id.,* Additionally, the legislative or administrative history could provide evi-. dence, "especially where there are contemporary statements by members of the decision-making body, minutes of its meetings, or reports." *Id.* at 268, 97 S.Ct. at 565. Finally, the Court concluded by explaining that its survey of potential evidentiary sources was not "exhaustive," but that the listed sources were "subjects of proper inquiry in determining whether racially discriminatory intent existed." *Id.*

As the foregoing discussion demonstrates, then, the crucial inquiry here under the Equal Protection Clause is whether the Defendants treated the Barnes differently than it treats (or would treat) similarly situated institutions that are not governed by African Americans, and if they did, whether the Defendants did so specifically *because* three of the Barnes's Trustees are African American. Furthermore, in order to prove that the Defendants harbored such a racially discriminatory purpose, the Barnes must show more than that the Defendants' application of their regulatory authority had a racially disproportionate impact, unless that impact is so "stark" as to be "unexplainable on grounds other than race." *See id.* at 266, 97 S.Ct. at 563. Because the Defendants' challenged actions here are explainable on grounds other than race, namely that they were undertaken to achieve the Defendants' asserted objectives of preserving the health, safety, and welfare of the residential neighborhood in which the Barnes is located, it is not enough for the Barnes simply to show that it was treated differently than similarly situated institutions that are not governed by African Americans. Rather, the Barnes must adduce additional direct or circumstantial evidence from which a racially discriminatory purpose can be inferred. *See id.,* As explained in

*Arlington Heights,* this additional evidence could consist of evidence of the historical background of the challenged decisions, the specific sequence of events leading up to the challenged decisions, departures from the procedural sequences or substantive criteria ordinarily applied in the type of decisions at issue, and the legislative or administrative history of the challenged decisions. *See id.* at 267–68, 97 S.Ct. at 564–65. Having identified the governing legal standards, I will now turn to a discussion of the Defendants' motions for summary judgment and the evidence the Barnes offers in opposition to these motions.

### 2. The Barnes's Evidence

Both the Township and the Commissioners moved for summary judgment under Rule 56, asserting that the Barnes does not have sufficient evidence to support its case under either the Equal Protection Clause or the Due Process Clause of the Fourteenth Amendment. As the Supreme Court explained in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion." *See id.* at 323, 106 S.Ct. at 2553. If the moving party does not bear the burden of persuasion at trial, as is the case here with respect to both the Township and the Commissioners, the moving party may meet its burden under Rule 56 by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See id.* at 325, 106 S.Ct. at 2554.

 Accompanying their motions for summary judgment, the Township and Commissioners submitted memoranda of law spanning 51 and 76 pages respectively, a joint 54–page Statement of Undisputed Facts, and a joint appendix that takes six large boxes to house and that contains literally tens of thousands of pages of documents, depositions, and answers to interrogatories. In their memoranda of law, the Defendants

---

plans to construct racially integrated low-income housing in that community that would be permissible under the multiple-family designation, but

not the newly adopted single-family designation. *See id.* at 267, 97 S.Ct. at 564–65.

point to the deposition testimony of numerous witnesses, both for the Defendants and for the Barnes, in which the witnesses testify that they have no knowledge of any race-based actions taken by the Defendants toward the Barnes, that the Barnes was treated no differently than its institutional neighbors, and that the Defendants were acting only for the purposes of resolving the dispute between the Barnes and its residential neighbors and of preserving the health, safety, and welfare of the residential neighborhood in which the Barnes is located. Given this record, I conclude that the Defendants have met their initial burden of "informing the district court of the basis" for their motions. *Cf. Wisniewski v. Johns–Manville Corp.*, 812 F.2d 81, 84 (3d Cir.1987) (concluding that asbestos manufacturers in consolidated appeals had properly supported their motions for summary judgment under *Celotex* by submitting 200 and 300 pages, respectively, worth of exhibits and affidavits and by pointing out the absence of supporting evidence for the plaintiffs' intentional tort claims).

Because the Defendants have met their initial burden under Rule 56, the burden now shifts to the Barnes to "set forth specific facts showing there is a genuine issue for trial." *See* Fed.R.Civ.P. 56(e). An issue is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, in reviewing the Barnes's evidence, I must determine whether the Barnes has offered admissible evidence that would allow a jury to return a verdict in its favor, which pursuant to the Equal Protection Clause would mean that the Barnes's evidence would be sufficient to allow a jury to conclude that the Defendants treated it differently than simi-

larly situated institutions and that they did so because three of its Trustees are African American. Moreover, in determining what evidence would be legally sufficient to allow a jury to draw this conclusion, I must keep in mind that proof of racially disproportionate impact—that is, proof that the Barnes had been treated differently than similarly situated institutions not governed by African Americans—would not be enough, standing alone, to support the inference of purposeful discrimination, because the Defendants' actions are explainable on grounds other than race. *See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977). Thus, in determining whether the Barnes's evidence is sufficient to allow a jury to conclude that the Defendants intentionally discriminated against the Barnes on the basis of race, I must determine whether the Barnes has adduced additional circumstantial evidence, beyond evidence of the simple fact of differential treatment itself, from which a jury could reasonably infer that the Defendants' actions were actually motivated by a racially discriminatory purpose. *See id.*,

Turning then, to the evidence the Barnes has offered in opposition to the Defendants' motions for summary judgment, the Barnes submitted a document entitled "Statement of Material Facts Supported by Substantial Evidence," in which it sets forth an enormous amount of alleged facts that it contends require a trial.[9] After a searching review of the evidence the Barnes adduced in support of these allegations, I have concluded that the Barnes has produced no evidence whatsoever that any of the Defendants' actions were motivated by a racially discriminatory purpose. Indeed, the vast majority of the Barnes's evidence has nothing to do with

---

**9.** Many of the facts that the Barnes lists in its "Statement of Material Facts Supported by Substantial Evidence" do not contain any citation to record evidence (e.g., SMF, ¶¶ 108, 182) or contain citations to "[e]ntire record herein," (e.g., SMF, ¶ 158), "[f]acts and evidence cited below," (e.g., SMF, ¶ 143), and other similarly general references. For a great portion of the other facts, the Barnes identifies one or more depositions but provides no page references, such as paragraph 29, in which it refers to "all Commissioner and Township employee depositions." I

cannot address these asserted facts because without any specific citations to the affidavits, depositions, answers to interrogatories, or admissions on file, such facts are merely unsupported allegations and may not be considered on a motion for summary judgment. *See* Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Furthermore, without specific citations, I am unable to sufficiently verify the accuracy of these alleged facts to consider them.

race, but merely details various stages of a run of the mill land dispute. If this evidence were enough to make out a constitutional violation, then municipalities would face a civil rights trial every time an aggressive developer loses a battle in a zoning dispute. I will canvass this evidence in an appendix to this memorandum.

In the body of this memorandum, I will discuss the few pieces of evidence proffered by the Barnes that are even arguably related to race. This evidence consists of the following: (1) that Commissioner Zemble referred to a letter written by the Barnes's President as "rude"; (2) that unidentified protesters picketed the Barnes with signs displaying the messages "From LA to PA Money Buys Justice" and "Lincoln University Go Home"; (3) that one of the Barnes's residential neighbors who spoke at a public meeting of the Commissioners compared the Barnes's President to a "carpetbagger"; (4) that the Defendants granted a zoning concession to an ambulance company that wanted to locate in a section of South Ardmore populated predominantly by African American residents; (5) a hearsay statement that Commissioner Manko allegedly commented to a news reporter that at some point during his eighteen years of service on the Township's Board of Commissioners, other board members had said "Let's stick it to Ardmore because there are black people there"; and (6) that a Township official wrote a memorandum about Ardmore in which she stated that she did not "wish to see these responses used to defend discriminatory, or the perception of discriminatory practices." These items represent the strongest evidence the Barnes has to support its civil rights claim, but even these fail to create a genuine issue of material fact. As I will analyze below, none of this evidence

demonstrates that any of the Defendants acted with a racially discriminatory purpose.

### a. The Defendants' Reaction to the Barnes's November 9, 1995 Letter

The Barnes contends that Commissioner Zemble used several "words directly tied to racially derrogatory [sic] attitudes" when asked in a deposition about a letter that the Barnes's President, Richard Glanton, wrote on November 9, 1995 to the Township on behalf of the Barnes.[10] (SMF, ¶ 262.) The Barnes focuses on the words "arrogant" and "rude" and on the statements that Glanton did not do things "the way business is done in Lower Merion Township" and that the November 9, 1995 letter was "not the way the Township expects to hear from an institution." (SMF, ¶ 262.)

 With the exception of the word "rude," however, all of these words and statements were supplied by the Barnes's counsel in Zemble's deposition. (Defs.' Ex. 68.3, at 383–86.) Thus, it was plaintiff's counsel who asked Zemble whether the November 9, 1995 letter was "an arrogant letter?", to which she replied "[y]es"; it was plaintiff's counsel who asked Zemble whether she thought the letter was "[n]ot the way the Township expects to hear from an institution?", to which she replied "[n]o"; and it was plaintiff's counsel who asked "[i]t is not the way business is done in Lower Merion Township; is it?", to which Zemble never even responded because her attorney interrupted the questioning and plaintiff's counsel never returned to the pending question for an answer. (Defs.' Ex. 68.3, 383–85.) Thus, the Barnes seeks to show that Zemble expressed racial animus toward Glanton on the basis of specific words and phrases that its counsel put in her mouth.[11] This evidence does not create a genuine issue of material fact.

---

10. The rest of the evidence the Barnes cites shows that Township Manager David Latshaw did not understand the Barnes's November 9, 1995 letter to be making a charge of discrimination, but rather only setting forth Richard Glanton's opinion that the Barnes had been responsive to the Township and that getting permits from the Township was like getting a visa to emigrate from the Soviet Union, an opinion with which Latshaw disagreed. (Defs.' Ex. 35.1, at 85–93.) Furthermore, the Barnes's evidence shows that the Township responded to the No-

vember 9, 1995 letter by holding a meeting with Barnes representatives at 4:30 that same afternoon. (Defs.' Ex. 35.1, at 98.)

11. Likewise, the Barnes's submits that Zemble was "very angry" when she read the November 9, 1995 letter, (SMF, ¶ 262), but again, the source of this asserted fact derives from the Barnes's counsel, not Zemble. In her deposition, Zemble only states that "I suppose you could say I was angry at this letter," whereas it is the Barnes's counsel who asked the eliciting

■ It is true that Zemble testified that she found the November 9, 1995 letter "bullying" and "rude," (Defs.' Ex. 68.3, at 383–84), which the Barnes would have its experts testify are racially derogatory words. (Pl.'s Ex. 4; Pl.'s Ex. 5.) Certainly, if "bullying" or "rude" is used to convey the attitude that African Americans should not be challenging white society, then the words "bullying" and "rude" thereby assume a racially derogatory meaning. But neither word has an exclusive or even predominantly racial meaning, and the Barnes has not pointed to any evidence other than the very words themselves to show that Zemble intended to convey a racially derogatory meaning when she used those words. The mere fact that these words were employed to describe a letter authored by an African American does not show that they were aimed at the race of the author rather than the contents of the letter. Accordingly, this evidence does not create a genuine issue of material fact.[12]

### b. *Picketing at the Reopening Gala Events*

■ The Barnes also claims that on November 10 and 11, 1995, during the Barnes's Reopening Gala Events, some of the Barnes's residential neighbors were seen standing next to picketers holding signs displaying the messages "From LA to PA Money Buys Justice" and "Lincoln University Go Home."[13] The Barnes offers this evidence to show that the Defendants were aware that the Barnes's residential neighbors did not oppose the Barnes out of any legitimate concerns about the quality of their neighborhood, but rather out of racial animus toward the Barnes's Trustees and Lincoln University. Although it would be a matter of some concern if the Barnes could show that the Defendants believed that most of the neighbors who were voicing complaints about the Barnes's reopening were seeking action in order to further racially motivated objectives, the Barnes has not demonstrated any connection between the neighbors and the picketers here.

Although the Barnes does not offer admissible evidence showing that the picketing events actually occurred,[14] the Barnes does offer evidence that Commissioners Wolek and Ettelson were aware at some point that the *Philadelphia Inquirer* had printed a story reporting that the picketing events had occurred. (Defs.' Ex. 16.2, at 566; Defs.' Ex. 67.1, at 135.) The Barnes does not offer any evidence, however, that the Barnes's residential neighbors were seen standing with the picketers or that the Defendants believed the neighbors had done so.

The article itself only identifies the signholders as "protesters" and provides no further information about who they were or who was seen standing in proximity with them. (Pl.'s Ex. 128.) As for Commissioner Ettelson's awareness of the events, he testified that he thought he first learned of the picketing events by reading about them in the *Philadelphia Inquirer* article and that he did no investigation to verify whether the events were true. (Defs.' Ex. 16.2, at 565.) Furthermore, he testified that it did not occur to him that the Barnes's residential neighbors

---

question, "[w]hen is the first time you really became angry with Mr. Glanton?" (Defs.' Ex. 68.3, at 387.)

12. The Barnes claims that its residential neighbors expressed racial animus toward Richard Glanton as well, but the evidence it offers either does not support this claim or is irrelevant. The Barnes claims that its neighbors displayed racially derogatory signs in front of their homes, such as "outsiders," but it cites to a portion of Thomas Henry Massaro's affidavit in which he does not discuss the Barnes or its residential neighbors, but rather only opines that suburban residents often fear "outsiders." (SMF, ¶ 258; Pl.'s Ex. 10, 18.) The Barnes also claims that one of the Barnes's residential neighbors, Robert Marmon, referred to Glanton as a "lying you-know-what,"

(SMF, ¶ 259), but offers no evidence that any of the Defendants were present when the statement was said or that they were otherwise aware of it.

13. The Barnes offers evidence that Lincoln University appoints four of the Barnes's Trustees and is traditionally recognized as an African American institution. (Pl.'s Ex. 13, ¶¶ 15, 17.)

14. The Barnes offers only a newspaper article published in the *Philadelphia Inquirer* reporting that such picketers and signs had been seen. The newspaper article is hearsay and cannot be considered on a motion for summary judgment. *See Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 n. 1 (3d Cir.1996); *Horta v. Sullivan*, 4 F.3d 2, 8–9 (1st Cir.1993).

were involved with the picketers, but rather that he thought the picketers must have been some upset students. (*Id.*) Finally, he testified that he did not view the sign displaying the message "From LA to PA Money Buys Justice" as involving any racial connotation and that he did not know who was involved in the picketing. (*Id.* at 566–67.) Commissioner Wolek similarly testified that she learned of the picketing either by reading about it in the newspaper article or by hearing it from someone else, that she did not think the signs had racial overtones, and that she did not know whether any of the Barnes's residential neighbors were involved in the picketing. (Defs.' Ex. 67.1, at 133–36.)

Even if the Barnes could show that the Commissioners must have recognized racial overtones in the signs, as it would have its expert James W. Loewen testify, (SMF, ¶¶ 241, 243), the Barnes has offered no evidence to show that any of the Barnes's residential neighbors were involved in the picketing or that any of the Defendants believed they had been.[15] Merely showing that the Defendants were aware that some individuals in the world view the Barnes with racial animus hardly shows that any of the Defendants' conduct was motivated by racial animus. Accordingly, the Barnes's evidence with respect to the picketers does not create a genuine issue of material fact.

### c. The Comments of Residential Neighbor Robert Marmon at the Commissioners' Public Meeting Held on November 15, 1995

 The Barnes points to statements made by Robert Marmon, one of the Barnes's residential neighbors, at a public meeting held by the Commissioners on November 15, 1995.[16] During that meeting, Marmon stated, among other things, that "[o]utsiders have taken over the Barnes," that "Mr. Glanton and his people" had not been long-standing taxpayers in the community, and that he finally understood "what a carpetbagger is and how one operates." (Pl.'s Ex. 123, at 10; Doc. # 289, ¶ 256.)

I will assume for present purposes that the trier of fact could reasonably infer that Marmon's use of phrases like "carpetbagger" might have led the Commissioners to believe that Marmon was not motivated by wholly legitimate concerns. Even assuming this fact, however, this evidence does not show that the Commissioners undertook any of their challenged actions for the purpose of effectuating any racial animus. Eight other residential neighbors also spoke at some length during the November 15, 1995 meeting, as reflected in the minutes of the meeting, (Pl.'s Ex. 123, at 8–14), and the Barnes

---

15. The Barnes cites no evidence that shows that the Barnes's residential neighbors were involved in the picketing. The only supporting evidence the Barnes cites for its claim that "[s]ome of the Latches Lane neighbors stood with the picketers carrying the signs on November 10 and 11, 1995" are pageless references to three depositions and a citation to "Videotape, Marmon–10." (SMF, ¶ 238–A.) If by "Marmon–10" the Barnes means exhibit 10 to Robert Marmon's deposition, this evidence shows nothing because this exhibit is merely a photocopy of the top of a videocassette labeled "Nite November 11." (Defs.' Ex. 38.2, Ex. 10.) If by "Videotape" the Barnes means Exhibit 75.2 to the Township's Motion for Summary Judgment, a videocassette labeled "Marmon Video," this evidence is unhelpful without additional evidence, either by affidavit or deposition testimony, identifying the various individuals appearing in the video.

Richard Glanton's testimony about allegedly racially derogatory signs displayed by picketers in Washington, D.C. during the international tour of the Barnes's art is irrelevant because Glanton specifically testified that he has no

knowledge that any residential neighbor or Commissioner was involved in the incident. (Defs.' Ex. 20.4, at 633–34.)

The Barnes's claim that various members of the "Barnes Watch" organization attended Township meetings in which the Barnes was discussed, (SMF, ¶ 238–C, 244), is irrelevant because the Barnes does not provide any support for its allegation that the signs displayed during the Reopening Gala Events were supplied by the "Barnes Watch." (SMF, ¶ 244.) For the same reason, the Barnes's claim that a few of the Barnes's residential neighbors had various dealings with the "Barnes Watch," (SMF, ¶ 244) is also irrelevant.

16. The Barnes also claims that "[n]umerous other words and phrases were used at the public meeting November 15, 1995 that conveyed race and introduced race as a consideration," (SMF, ¶ 303), but it does not identify any of those "other words and phrases," and thus this allegation does not "set forth specific facts showing that there is a genuine issue for trial," as required by Federal Rule of Civil Procedure 56(e).

has not offered evidence that their comments, which generally discuss the impact the anticipated crowds and traffic would have on the safety and welfare of the neighborhood, conveyed racial animus toward the Barnes's Trustees or Lincoln University. A jury could not reasonably conclude that the Commissioners undertook any of the challenged actions because of the race of the Barnes's Trustees, rather than out of a concern for the neighborhood, based simply on the fact that a public meeting attracted one speaker who favored certain actions out of personal racial bias.[17] Accordingly, this evidence does not create a genuine issue of material fact.[18]

#### d. The Township's Relations with Residents in Ardmore

The Barnes offers evidence of various interactions between the Defendants and individual residents living in South Ardmore and other Lower Merion neighborhoods, which it contends would show that the Township responds vigorously when white residents complain about intrusive land uses that benefit African American residents, but pays little attention when African American residents complain about intrusive land uses that benefit white residents. (Doc. # 323, at 1–9, 58–

69; SMF, ¶¶ 2–3, 25 to 102–A, 360, 366–67.) The evidence the Barnes proffers in support of this claim does not show that the Defendants undertook any of their actions with respect to individual residents in Ardmore or other neighborhoods on the basis of race. Even if it had made such a showing, this evidence would not allow a jury to conclude that the Defendants had therefore also targeted the Barnes for unequal treatment because three of its Trustees are African American.

■ Turning to the evidence the Barnes offers in support of its claim, even its strongest example, a zoning concession to an ambulance company (the Narberth Ambulance Corps) that wanted to locate in a South Ardmore neighborhood, fails to show that the Defendants ignored the complaints of African American residents in South Ardmore or that they undertook any of their actions with a discriminatory purpose.

To begin with, the Barnes characterizes the Narberth Ambulance Corps as a "white" organization, yet it offers no evidence of the organization's racial composition aside from the testimony of Mary Jordan, president of the board of directors of the ambulance company, who stated that the organization had

---

**17.** Although of limited significance, because the Court was reviewing a judge's findings made after a bench trial rather than the grant of a motion for summary judgment, it is worth noting that the Supreme Court concluded in *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), that the municipality involved there did not violate the Equal Protection Clause when it denied a developer's request to rezone a parcel of land in order to construct a low-income housing project, even though the record revealed that some of the public opposition to the project may have been racially motivated. In assessing the municipality's actions under the Equal Protection Clause, the Court noted that it had reviewed the evidence presented in the district court and determined that this evidence did not warrant overturning the district court's findings that the municipality did not have a' discriminatory purpose. *See id.* at 269–70, 97 S.Ct. at 565–66. The Court noted that the district court had found that some of the opponents of the housing project who spoke at three public hearings "might have been motivated by opposition to minority groups," but that the district court had further concluded that this evidence did not " 'warrant the conclusion that this motivated the defen-

dants.' " *Id.* at 269, 97 S.Ct. at 565 (quoting *Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights*, 373 F.Supp. 208, 211 (N.D.Ill. 1974)). Although the Court was thus obviously aware that the record reflected possible racial bias on the part of many of the public commentators, the Court did not find this evidence significant enough to even mention in its own discussion of the evidence. *See id.* at 269–71, 97 S.Ct. at 565–66. Of course, concluding that evidence about the public commentators did not compel a finding for the developer is not the same as concluding that such evidence could not support such a finding, but the fact that the Court did not even find need to address such evidence in its own analysis suggests that it did not find the evidence terribly significant in assessing the defendants' intent.

**18.** Likewise the fact that Commissioner Gloria Wolek stated in a letter to the neighbors that the Commissioners were "moved" by the comments made at the November 15, 1995 meeting, (Defs.' Ex. 23.1, Ex. 15, at 1), does not show that the Defendants acted with a racially discriminatory purpose, just because one speaker's comments included the word "carpetbagger."

both white and African–American members. (Defs.' Ex. 27.1, at 86–88.) Likewise, the Barnes does not offer any evidence of the racial composition of the neighbors who complained about the ambulance service, aside from what can be inferred from the fact that South Ardmore is predominately populated by African–American residents. (Pl.'s Ex. 15, at 39; Pl.'s Ex. 16, at 52.)

As for the substance of its claim that the Defendants ignored the South Ardmore residents' complaints about the proposed location of the Narberth Ambulance Corps, the Barnes offers evidence that the Corps requested the Township to waive certain zoning requirements so it could operate its business out of the property it purchased on Ardmore Avenue, that the Township staff held a meeting in January 1995 in which neighbors objected to the location of the ambulance company on Ardmore Avenue, that the Township later amended its zoning code in June 1995 to permit emergency services to operate in residential communities, that the Commissioners held a special meeting in January 1996 in which the neighbors again complained about the location of the ambulance company, and that the ambulance company ultimately relocated to another site. (Defs.' Ex. 27.1, at 20–21; Pl.'s Ex. 161; Pl.'s Ex. 163, at 3; Pl.'s Ex. 159; Pl.'s Ex. 160; Pl.'s Ex. 16, at 121.).

Although the Township did amend its zoning code to permit the location of emergency services in residential areas, which effectively removed one obstacle to the Narberth ambulance company's use of the Ardmore Avenue site, the Barnes's evidence also reveals that the Township did so only by establishing a public conditional use process in which the ambulance company would have to establish compliance with fifteen requirements. (Pl.'s Ex. 163, at 3; Pl.'s Ex. 167.) Thus, by amending its zoning code, the Township did not approve the Narberth ambulance company's proposed use of the Ardmore Avenue site, but rather only established a process by which the ambulance company could obtain approval if it successfully completed the conditional use process.

Furthermore, the Barnes's evidence shows that the Commissioners called the January 1996 meeting specifically for the purpose of listening to the South Ardmore residents' concerns about their community, which included the proposed location of the Narberth ambulance company. (Pl.'s Ex. 159; Pl.'s Ex. 160.) The Barnes's evidence also shows that following that meeting, Township Director of Planning & Community Development Ann Hutchinson wrote a memorandum to Township Manager David Latshaw in which she noted the community's opposition to the Narberth ambulance company and emphasized that the ambulance company "carries the burden of demonstrating how they will comply with Township regulations" and that "[t]he public is strongly encouraged to attend" the public meetings in which the company's conditional use application would be considered.[19] (Pl.'s Ex. 167.) Thus, although the Barnes's evidence, viewed in the light most favorable to the Barnes, suggests that the Township granted the Narberth ambulance company a zoning concession despite knowledge of the neighbors' opposition, the Barnes's evidence also shows that this zoning concession had no immediate practical benefit because the Narberth ambulance company still had to complete the conditional use process, which the Township appeared ready to enforce vigorously in light of the community's opposition.

The Barnes's evidence with respect to the other examples of the Defendants' alleged differential responses to the complaints of white and African American residents does not merit extended discussion. Whereas the Barnes's evidence with respect to the Narberth ambulance company at least suggests that a landowner obtained some form of desired zoning relief despite community opposition, the Barnes's evidence with respect to

**19.** Although immaterial for purposes of summary judgment because the jury is free to disbelieve her testimony, the president of the board of directors of the Narberth ambulance company, Mary Jordan, testified that in response to the Ardmore community's opposition to the Nar-berth ambulance company, Commissioners Sonenshein, Ettelson, and Rosenthal requested the Narberth ambulance company to find another location to place its ambulance service. (Defs.' Ex. 27.1, at 24–29.)

the other examples of differential responses simply fails to support the Barnes's claims.[20]

Even assuming arguendo that the Barnes had produced evidence to support its claim that the Township responds differently when African American residents complain about land uses than it does when white residents complain, this evidence would not create a genuine issue of material fact. The Barnes argues that discrimination against residents in South Ardmore would be circumstantial evidence under *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and "the Title VII jurisprudence" that the Township had likewise discriminated against the Barnes. (Doc. # 323, at 59.) The Commissioners, by contrast, rely on *Arlington Heights* to support their position that such evidence is completely irrelevant to this action. (Doc. # 343, at 77, 81–84.)

The Supreme Court's opinion in *Arlington Heights* is not particularly enlightening with respect to either position, however, because the facts of that case did not involve evidence of the defendants' discriminatory treatment of other developers or residents, nor did the Court's discussion of circumstantial evidence touch on a defendant's discrimination against others. Of the various types of circumstantial evidence discussed by the Court, the racial impact of the challenged decision, the specific sequence of events leading up to the decision, any procedural or substantive departures involved in the decision, and the legislative or administrative history surrounding the decision, *see id.* at 266–68, 97 S.Ct. at 563–65, all obviously involve aspects of the challenged decision itself. The only other factor discussed by the Court, the historical background of the decision, might appear to encompass evidence of discrimination against others, particularly given the Court's statement that such evidence would be especially probative "if it reveals a series of official actions taken for invidious purposes." *See id.* at 267, 97 S.Ct. at 564. I do not believe that the Court understood its use of the term "historical background" to mean evidence of discrimination against others, however, because none of the cases cited by the Court in support of its statement involved considerations of evidence of discrimination against others. *See Lane v. Wilson,* 307 U.S. 268, 275–77, 59 S.Ct. 872, 876–77, 83 L.Ed. 1281 (1939) (assessing the validity of a

---

20. For example, the Barnes claims that white neighbors objected to a proposed low-income project in Bala Cynwyd because they feared African American families would reside there and that in response to the neighbors' complaints, the Township pressured the developer to convert the project from family housing to either a cancer counseling center or elderly housing. (SMF, ¶¶ 82–93.) The Barnes fails to produce evidence, however, that the complaining neighbors were white, that they feared that the housing project would attract African–American families, or that the Township pressured the developer to convert its project from family housing to elderly housing. Rather, the Barnes asks the factfinder to infer simply from the fact that the developer intended to construct a low-income housing project and that the neighborhood club opposed the project that the reason the neighborhood club opposed the project must have been because they thought it would attract African–American families. In any case, even a showing that the neighbors may have been aware that the project's tenants would likely be African–American, without more, does not show that the neighbors opposed the project because of that fact, much less that the Township knew of such motivation and acted in furtherance of it.

Furthermore, the Barnes's evidence of the Township's "pressure" amounts to a request by Commissioner Manko that the developer consider another organization's proposal to purchase the land from the developer so that it could open up a cancer counseling center, (Pl.'s Ex. 17, at 64–71), and Commissioner Ettelson's efforts to act as a mediator between the developer and the neighborhood association, which ultimately resulted in an agreement between the developer and the neighborhood association to devote the property to elderly housing, with the assistance of the association's fundraising and landscaping services. (Pl's Ex. 17, at 71–74; Defs.' Ex. 67.1, at 84–89.) The Barnes's evidence does not reveal what position Ettelson took, if any, with respect to the housing project's use, but only that he tried to help the two groups resolve their differences. (Pl.'s Ex. 17, at 71–73; Defs.' Ex. 67.1, at 84–89.) Although the Barnes offers additional evidence, this evidence does no more than that already discussed to advance the Barnes's claims, and in sum, the Barnes's evidence simply does not support its claim that the Township pressured the developer to devote its property to elderly housing in order to allay the fears of white neighbors that the property might house African–American families.

The evidence advanced to support the other alleged instances of differential responsiveness is similarly unsupportive and need not be canvassed here.

voter qualification statute that exempted from its requirements all persons who had voted in the previous election, who, in turn, had been qualified to vote under the predecessor statute which effectively exempted all white voters from a literacy test through the operation of a "grandfather clause," and concluding that the challenged statute was simply a substitute for the invalidated "grandfather clause" of the previous statute and therefore equally invalid); *Griffin v. County Sch. Bd.*, 377 U.S. 218, 221–23 & n. 6, 84 S.Ct. 1226, 1228–29 & n. 6, 12 L.Ed.2d 256 (1964) (assessing the validity of state and county laws that effectively closed all public schools in Prince Edward County, Virginia, and provided tuition assistance and tax credits to parents of children attending private schools in light of the fact that a predecessor statute requiring school segregation in Prince Edward County had been declared unconstitutional, that subsequent legislation closing all integrated schools in Virginia had been struck down by the Court of Appeals of Virginia, and that the present legislation had been accompanied by the explanation that an educationally beneficial atmosphere could not be maintained in the face of a federal court order to integrate public schools); *Davis v. Schnell*, 81 F.Supp. 872, 878–80 (S.D.Ala.) (assessing the validity of an amendment to the Alabama Constitution that imposed as a requirement of voter registration that applicants "understand and explain" any provision of the United States Constitution in light of the fact that the amendment's sponsors and supporters championed the amendment as a means to preserve "white supremacy" by giving the boards of registrars the arbitrary power to deny the franchise to African American applicants), *aff'd per curiam*, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093 (1949); *Keyes v. School Dist. No. 1*, 413 U.S. 189, 198–99, 207–09, 93 S.Ct. 2686, 2692–93, 2696–98, 37 L.Ed.2d 548 (1973) (assessing whether segregated public schools in Denver, Colorado were the product of intentional discrimi-

nation by the school board in light of the fact that the lower courts had found that the school district had intentionally maintained segregation during the previous ten years in another portion of the school district which was attended by nearly forty percent of the district's African American public school children).

Thus, I am unable to conclude that the *Arlington Heights* Court understood the term "historical background of the decision," or any of the other factors discussed in its opinion, to refer to evidence of past discrimination against others in unrelated contexts. On the other hand, I am also unable to embrace the Commissioners' argument that the Court declared such evidence irrelevant, because the Court did not directly address the use of such evidence. Furthermore, the Court began its discussion by stating that the search for discriminatory intent "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" and concluded by noting that its discussion of circumstantial evidence was not purported to be "exhaustive." *See id.* at 266, 268, 97 S.Ct. at 563–64, 565. Thus, the Court's opinion in *Arlington Heights* is inconclusive with respect to the propriety of using evidence of a defendant's past discrimination against others in different contexts to prove purposeful discrimination against the plaintiff.

Beyond *Arlington Heights*, the Barnes relies on the Supreme Court's opinion in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and several appellate cases to support its proffered use of what it calls "other act" evidence.[21] (Doc. # 323, at 47–49, 58–60.) These cases generally involve employment or housing discrimination claims, and the "other acts" to which the courts point generally involve a single employer's or landlord's similar discriminatory treatment of other em-

---

**21.** The Barnes also relies on *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126 (3d Cir.1977) as support for the introduction of "other acts" evidence, (Doc. # 323, at 48), but this case does not support the Barnes's characterization. The Barnes claims that the *Rizzo* court "reexamined and relied upon the pattern of public housing

practices in determining if racial animus was a factor in the single project at issue," (Doc. # 323, at 48), but an examination of the court's opinion reveals that it relied only on the conduct involved in the particular housing project at issue. *See id.* at 143–44.

ployees or tenants.[22] That is, if the plaintiff claims that she was fired for refusing her employer's sexual advances, courts may look to evidence that the employer sexually harassed other employees as an aid in determining whether the employer acted with a discriminatory purpose in firing the plaintiff. *See, e.g., Heyne v. Caruso,* 69 F.3d 1475, 1480–81 (9th Cir.1995).

Less common are cases involving evidence of allegedly discriminatory conduct in dissimilar contexts or decisions, and some courts have demonstrated greater reluctance to rely on such "other act" evidence under these circumstances. For example, in *Riordan v. Kempiners,* 831 F.2d 690 (7th Cir.1987), a case on which the Barnes relies heavily, the court distinguished between evidence of wage disparities and evidence of differential work assignments in an employment discrimination claim stemming from the employer's denial of a pay raise. As the Barnes notes, the court recognized that "[a] plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled by evidentiary rulings that keep out probative evidence because of crabbed notions of relevance or excessive mistrust of juries." *See id.* at 698. Furthermore, the court in *Riordan* concluded that evidence that the plaintiff's superior "always recommended higher pay for men than women" would be "some evidence" that the plaintiff had been denied a raise because she was a woman. *See id.* On the other hand, the court also concluded that the lower court properly excluded evidence that the defendant's successor had acknowledged a study which reported that the Department of

Health had "underutilized" women. *See id.* This exclusion is significant because under the Barnes's line of argument, this evidence, as an admission that the Department had not given its women employees the degree of responsibility that it should have, could be cited as evidence of discrimination against women in the Department, from which the factfinder could infer that the Department must have likewise discriminated against the plaintiff when it denied her a raise. The Seventh Circuit, however, excluded this evidence and explained that it was "entirely remote from the question of pay equity" and "potentially prejudicial." *See id.* Thus, although recognizing the importance of protecting a plaintiff's circumstantial evidence of discrimination from exclusion under "crabbed notions of relevance," the Seventh Circuit nonetheless found the chain of inference too attenuated when the plaintiff sought to prove her employer's discriminatory denial of a pay raise through evidence of the employer's alleged discriminatory utilization of female employees in the Department.

Thus, the cases the Barnes advances in support of its "other act" evidence do not provide much more compelling support for or against the propriety of using such evidence than the Supreme Court's opinion in *Arlington Heights* does. This is not to suggest that the case law is barren of any arguable support for the Barnes's position or that the *Riordan* court's approach is necessarily uniform, *see, Estes v. Dick Smith Ford, Inc.,* 856 F.2d 1097, 1102–04 (8th Cir.1988); *but cf. Callanan v. Runyun,* 75 F.3d 1293, 1297–98

---

**22.** For example, in *McDonnell Douglas,* a case involving an employee's challenge under Title VII of the 1964 Civil Rights Act to his employer's refusal to rehire him following a layoff, the Supreme Court stated that the employer's "general policy and practice with respect to minority employment" could be relevant to show that the employer's asserted reasons for not hiring the plaintiff were pretextual. *See McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. at 1825–26. The Court noted that statistical evidence of the racial composition of the employer's workforce could be relevant, although it "caution[ed] that such general determinations, while helpful, may not be in and of themselves controlling as to an individualized hiring decision." *See id.,* at 805 & n. 19, 93 S.Ct. at 1825–26 & n. 19; *see also Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994)

(citing as examples of evidence that a Title VII plaintiff could advance in support of his claim of discriminatory refusal to hire evidence "that the employer in the past had subjected him to unlawful discriminatory treatment" or evidence "that the employer has discriminated against other members of his protected class or other protected categories of persons"); *Miller v. Poretsky,* 595 F.2d 780, 782–84 (D.C.Cir.1978) (concluding, in a case involving a tenant's challenge under the Fair Housing Act of 1968 to the landlord's treatment of him during his tenancy and subsequent eviction, that the lower court erred in excluding "evidence of alleged incidents of discrimination involving other ... tenants similar to those which [plaintiff] himself claimed to have suffered").

(8th Cir.1996), but the cases on which the Barnes relies simply do not point to a clear outcome here. Perhaps it is not to be expected that a definitive rule will emerge from such a fact-intensive area of the law, and the Barnes's proffered evidence must be assessed in light of what principles do emerge as they apply to the facts and circumstances of this particular case.

■ Here, the other acts of discrimination that the Barnes alleges are not against other prestigious art or educational institutions with respect to their renovations or expansions in use, but rather against individual residents in South Ardmore or applicants for low-income housing with respect to the protection of the zoning laws. Although it may not always be easy to draw the line, it seems fair to say that as the differences between the individuals affected and the decisions involved increase, the inference of discrimination arising from past instances of discrimination becomes more attenuated and remote. Although it appears questionable to say that such instances bear no relevance whatsoever to the question of discriminatory intent, and although it is possible that examination of a record actually displaying such past discrimination against Ardmore residents might present a different picture, I cannot conclude on a record in which such instances remain no more than allegations that had such instances been supported with admissible evidence, a jury could reasonably find that the Defendants conducted their affairs with respect to the Barnes on the basis of a racially discriminatory purpose.

Accordingly, because the Barnes has not produced evidence to support its allegations that the Defendants respond more vigorously when white residents complain about land uses than when African American residents do so, and because in any case this evidence would not create a genuine issue whether the Defendants undertook any the challenged actions toward the Barnes with a racially discriminatory purpose, this evidence cannot defeat the Defendants' motions for summary judgment.

### e. Comments About Discrimination in Ardmore

The final evidentiary items in the record that bear any relation to race also concern the Defendants' relations with residents in Ardmore. The Barnes contends that during some point in the last eighteen years, unspecified members of the Township's Board of Commissioners have said "Let's stick it to Ardmore because there are black people there," and that in 1996, a Township official wrote a memorandum about Ardmore in which she wrote that she did not "wish to see these responses used to defend discriminatory, or the perception of discriminatory practices." As I will discuss below, the alleged comments by the Commissioners would be inadmissible at trial under the hearsay rule, and in any case, neither the Commissioners' alleged comments nor the Township official's memo would show that the Defendants targeted the Barnes for unequal treatment because three of its Trustees are African American.

#### i. Commissioner Manko's Alleged Statement

The Barnes offers as evidence a statement appearing in an article published by the newspaper *Philadelphia Weekly* in which Commissioner Joseph Manko is quoted as saying:

> "There are people on my board who, in the 18 years I've been serving, say, 'Let's stick it to Ardmore because there are black people there,'" Manko says. "I'm sure there are people on the board who don't have the same views I do on multiracial things. But in everyone there is some degree of feelings about race. You can't get away from that."

(Pl.'s Ex. 1, at 22.) In an affidavit, Robert R. Elliott, counsel for the Barnes, states that the quoted statement "is a statement recorded on a tape recorder by Karen Abbott, the author of [the article]." (Pl.'s Ex. 12, ¶ 2.) Furthermore, he states that the "quotation appears at page 22 of that article," and that "I was so informed by the reporter, Ms. Abbott." (*Id.*)

■ As an initial matter, this evidence presents an obvious hearsay problem. As

evidence that Manko made this statement, the Barnes offers only a copy of the newspaper article itself and the affidavit of Robert Elliott. The newspaper article is an out-of-court statement made by the reporter, Karen Abbott, offered to prove the truth of the matter asserted—that Manko actually said what was quoted above. *See* Fed.R.Evid. 801(c). Because this evidence does not fall within any of the exceptions to the hearsay rule, the Barnes would not be able to offer the newspaper article as evidence at trial, *see* Fed.R.Evid. 802, and thus the article cannot be considered on a motion for summary judgment. *See Philbin v. Trans Union Corp.,* 101 F.3d 957, 961 n. 1 (3d Cir.1996); *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 770 (3d Cir.1994); *Horta v. Sullivan,* 4 F.3d 2, 8–9 (1st Cir.1993).

■ As for Elliott's affidavit, he states only that a tape recording of the statement exists and that he was "so informed by the reporter, Ms. Abbott." (Pl.'s Ex. 12, ¶ 2.) If the Barnes intends to play the tape recording at trial to prove that Manko actually said what he was reported as saying, the tape recording would have to be authenticated under the Federal Rules of Evidence before it could be admitted at trial. In order to authenticate the tape recording, the Barnes would need to offer "evidence sufficient to support a finding that the matter in question is what its proponent claims," *see* Fed. R.Evid. 901(a), that is, that the tape recording is an accurate portrayal of the conversation between Commissioner Manko and Ms. Abbott, and it would then be up to the jury to decide whether the recording is authentic. *See* Fed.R.Evid. 901(a); *United States v. Reilly,* 33 F.3d 1396, 1404 (3d Cir.1994); *United States v. Goichman,* 547 F.2d 778, 784 (3d Cir.1976).

■ The Barnes has not produced any admissible evidence that would support a jury finding that the tape recording is authentic. The only evidence the Barnes offers in support of the recording's authenticity is Elliott's testimony, which would not be admissible at trial because Elliott does not have firsthand knowledge that the tape recording is accurate. Indeed, he explicitly states that he was "so informed by the reporter, Ms. Abbott," and thus reveals that his knowledge of the tape recording is based on second-hand knowledge obtained from speaking with Ms. Abbott. Elliott would not be able to testify that Ms. Abbott told him the recording is accurate because he would be offering her out-of-court statement to prove the truth of the matter asserted (that the tape recording is correct), in violation of the hearsay rule. *See* Fed.R.Evid. 801(c); Fed.R.Evid. 802. Thus, the Barnes has not offered evidence sufficient to support a finding that the tape recording is authentic (indeed it has offered no admissible evidence at all), and the tape recording would therefore be inadmissible at trial, even assuming that the Barnes would actually be able to produce the tape at trial. *See* Fed.R.Evid. 901(a).

■ The Barnes has offered no testimony by the reporter, Ms. Abbott. Only in a proffered Surreply to the Defendants' motions for summary judgment (for which leave to file was denied, *see* July 3, 1997 Order (doc. # 350)) does the Barnes suggest that "the tape recording is expected to be played to the jury to prove what he said, and Karen Abbott will testify to its accuracy." (Pl.'s Mot. Leave File Surreply Opp'g Summ. J. (doc. # 349), Ex. A, at 6). The Barnes offers only a promise that Ms. Abbott will appear at trial and that she will testify to unspecified facts that the Barnes vouches will properly authenticate the tape recording. This will not do. "[A] party who resists summary judgment cannot hold back his evidence until the time of trial . . . ." *Robin Constr. Co. v. United States,* 345 F.2d 610, 613 (3d Cir. 1965); *see also California Natural, Inc. v. Nestle Holdings, Inc.,* 631 F.Supp. 465, 470 (D.N.J.1986) ("The court must rule 'on the record the parties have actually presented, not on one potentially possible.'" (quoting *Madeirense do Brasil S/A v. Stulman–Emrick Lumber Co.,* 147 F.2d 399 (2d Cir. 1945))). When presented with a motion for summary judgment, the opposing party must reveal at that time the evidence it will present at trial so that the court can determine whether, assuming such evidence were presented, the opposing party's case could survive a motion for judgment as a matter of law under Rule 50 of the Federal Rules of

Civil Procedure. The Barnes's mere promise to produce a reporter who will testify to authenticity is not properly considered on a motion for summary judgment. *Cf. Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir.1990). Accordingly, the Barnes has not offered any evidence of Manko's alleged statement that would be admissible at trial, and thus this evidence cannot defeat the Defendants' motions for summary judgment. *See Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 n. 1 (3d Cir.1996); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 770 (3d Cir. 1994); *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir.1990); *Williams v. Borough of West Chester*, 891 F.2d 458, 466 n. 12 (3d Cir.1989) (Becker, J., opinion announcing the judgment of the court).

█ Although I cannot consider Commissioner Manko's alleged statement for the purpose of summary judgment because of the hearsay obstacles, I will discuss whether, assuming arguendo that the Barnes had overcome all hearsay objections, the statement would still be inadmissible for failure to show the existence of the conditions that would make this statement even arguably relevant. Manko allegedly stated that "[t]here are people on my board who, in the 18 years I've been serving, say, 'Let's stick it to Ardmore because there are black people there.'" Taking this as true for present purposes, the fact offered is that at least one member on the Township Board of Commissioners made this statement sometime in the last eighteen years. This fact might be relevant if either of two conditions were satisfied: (a) that member was one of the present Defendants, or (b) the statement was made in the presence of one or more of the present Defendants under circumstances from which it could be inferred that those Defendants agreed with or at least tolerated the expression of such views.

The Barnes has offered no evidence to show that either condition was satisfied, however. The statement itself provides no basis by which to determine whether the Ardmore statement was made two or fifteen years ago, or whether by current or long-departed commissioners. Nor does it provide any basis by

which to determine to whom and under what circumstances the Ardmore statement was made. Even assuming that Manko heard the Ardmore statement firsthand, his statement provides no basis for determining whether he heard it at a public meeting of the board of commissioners or whether he overheard it in a private discussion between a commissioner and an unrelated third party. Under Rule 104(b) of the Federal Rules of Evidence, "[w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." Fed.R.Evid. 104(b). Manko's statement would be inadmissible under Rule 104(b), and thus even assuming the statement were not barred by the hearsay rule, it still could not be considered on a motion for summary judgment.

█ Finally, in the event that all evidentiary objections should be resolved in the Barnes's favor on appeal, based on the record presented in this case, introduction of Commissioner Manko's statement into evidence would not create a genuine issue of material fact. As with the Barnes's attempts to show that the Defendants respond in a discriminatory manner when African Americans complain about undesirable land uses in Ardmore, evidence that a few Commissioners made stray racial remarks about individuals residing in Ardmore is far removed from the context in which decisions about the use and operation of the Barnes's art gallery were made. The fact that one or more of the Defendants had expressed a desire to take action based on the race of residents in Ardmore or had manifested a tolerance for such a view does not lead to the conclusion that the entire Board of Commissioners decided to take action against the Barnes based on the race of its Trustees. The inferential relation between these comments and the Defendants' motivation in taking action with respect to the Barnes's renovation and reopening of its art gallery is simply too attenuated and remote to allow a jury to conclude that the Defendants deliberately targeted the Barnes for unequal treatment because three

of its Trustees happen to be African American.

Thus, the Barnes has not demonstrated that it would be able to offer Commissioner Manko's alleged statement in admissible form at trial, and I therefore cannot consider it on a motion for summary judgment, and even if it were admissible at trial, it would not create a genuine issue of material fact.

### ii. *Ann Hutchinson's Memo*

 The second remark offered by the Barnes is a statement appearing in a one-page memorandum, dated February 5, 1996, addressed from Ann Hutchinson, Director of Planning & Community Development to David C. Latshaw, Township Manager. (Pl.'s Ex. 167.) The memorandum's subject is entitled "[f]ollow-up to January 12, 1996 Ardmore Meeting," and the body of the memorandum discusses "[i]ssues that affect Planning & Community Development operations." (*Id.*) The memorandum covers two topics: (a) a proposed affordable housing project at 13 St. Asaph's Road, and (b) the proposed location of the Ambulance Corps in South Ardmore. With respect to the housing project, Hutchinson notes that residents were aware that the Commissioners had "negotiated to change the tenor" of the housing project. She also notes that "[r]eaction to the housing project has been mixed," and that some Ardmore residents serve on the board of the development corporation promoting the housing "[i]n order to provide local representation." She also notes that the housing project had been delayed by unanticipated environmental contamination. Finally, she notes that the Commissioners and Ardmore community leaders were successful in closing a bar at the Ardmore Redevelopment site. With respect to the Ambulance Corps, Hutchinson notes that "[r]esidents perceive that the Township targets undesirable land uses to South Ardmore," and that they cited the Ambulance Corps as an example. She then notes that the Commissioners had previously adopted an ordinance that would permit emergency uses in residential neighborhoods provided such uses comply with the Conditional Use standards. Finally, she notes that the Ambulance Corps would carry the burden of demonstrating compliance with Township regulations in the land development process and that the public was strongly encouraged to attend the public meetings concerning the Ambulance Corps' application. At the end of the memorandum, Hutchinson states, "I hope that the issue of discrimination is addressed in a sensitive manner. In no way do I wish to see these responses used to defend discriminatory, or the perception of discriminatory practices." The Barnes relies on these last two sentences to show that Hutchinson "recognized discrimination." (SMF, ¶ 9.)

Even assuming arguendo that the Barnes's characterization of Hutchinson's memorandum could reasonably be inferred from her somewhat unclear statement, this evidence would not create a genuine issue of material fact. At best, this evidence would show that Hutchinson believed that some unspecified official or officials of the Township government were or might be involved in some form of discrimination, presumably against the residents of Ardmore, who were the only Township citizens discussed in her memorandum. Hutchinson does not discuss in the body of her memorandum why she believes discrimination may have been at issue. The only item mentioned in her memorandum that is even remotely suggestive of the issue is her statement that "[r]esidents perceive that the Township targets undesirable land uses to South Ardmore." Even this statement refers only to a perception of targeting, and it does not reveal what the residents perceived as the basis for such targeting, whether discriminatory or otherwise. Thus, at best, Hutchinson's statement amounts to an expressed belief that somebody in the Township government had discriminated in the past or might do so in the future, but it does not explain the basis upon which she held that belief.

Without more, her unexplained belief does no more to create a genuine issue of material fact than the unsupported legal conclusion of any other witness would. The bare charge of discrimination does not provide the factfinder with any factual basis by which to evaluate that charge, nor even with any basis by which to determine whether Hutchinson un-

derstood "discriminatory" to mean actions motivated by the degree of discriminatory intent required to establish an Equal Protection violation rather than actions merely carrying a racially disproportionate impact. Furthermore, Hutchinson's status as a Township official does not make the issue any more genuine. Her statement could not reasonably be characterized as an admission by her on behalf of the Township that she herself had taken discriminatory actions, given that she urged a "sensitive" handling of discrimination issues and "[i]n no way" wished to see any defense of discriminatory practices. Moreover, although it is possible that she obtained specific information by virtue of her position as a Township official that would support her belief of discrimination, I cannot conclude that her status alone is a sufficient basis to support a finding that she did. Without any other evidence sufficient to support a finding that she had such specific information, her subjective belief that discrimination had occurred would not be relevant, and thus this evidence would not be admissible under Federal Rule of Evidence 104(b). Accordingly, this evidence does not create a genuine issue of material fact.

### f. Conclusion

In conclusion, even the strongest evidence the Barnes proffers in support of its claim that the Defendants deprived it of its rights under the Equal Protection Clause of the Fourteenth Amendment fails to establish a genuine issue of material fact whether the Defendants purposefully discriminated against the Barnes on the basis of the race of its Trustees or their appointment by Lincoln University. The Defendants are entitled to judgment as a matter of law on the Barnes's Equal Protection Claim.

### B. DUE PROCESS

The Barnes contends that the actions described above and in the appendix, in addition to depriving it of its rights under the Equal Protection Clause, also deprived it of its rights under the Fourteenth Amendment's Due Process Clause. Specifically, the Barnes contends that the Defendants deprived it of the liberty interest of African

Americans in being treated equally. (Doc. # 323, at 36.) If by this argument the Barnes means that the Defendants deprived it of its due process rights by purposefully discriminating against it on the basis of the race of its Trustees, then little more need be added to what I have said above. Although it would certainly be correct to say that if the Defendants had purposefully discriminated against the Barnes, their actions would not have been rationally related to any legitimate governmental objective and thus would have violated the Barnes's substantive due process rights, *see, e.g., Midnight Sessions, Ltd. v. City of Phila.*, 945 F.2d 667, 683 (3d Cir. 1991), as discussed above, the Barnes has not offered sufficient evidence to show that the Defendants acted with a racially discriminatory purpose. Thus, the Barnes's claims under the Due Process Clause would fare no better than its claims under the Equal Protection Clause. The Barnes appears to offer a different argument here, however, which requires further discussion.

 The Barnes contends that official action does not have to be intentional to constitute a violation of the Due Process Clause. Rather, the Barnes claims that "the standard is gross negligence," which it defines as "a situation in which the actor should have known, through the exercise of his common sense and official responsibilities, that his action was denying a liberty or property right." (Doc. # 323, at 36.) As stated above, the liberty interest the Barnes identifies is the liberty interest in "equal treatment." (*Id.*) Thus, the Barnes concludes that under the Due Process Clause, "African Americans are ... entitled to not have local officials acting under color of state law deny through intention or gross negligence their right to enjoy and use their property equally." (Doc. # 323, at 37.) Essentially then, the Barnes contends that it need only show that the Defendants were grossly negligent in denying the Barnes its liberty interest in equal treatment.

Given this argument, it is apparent that by "equal treatment," the Barnes does not mean merely freedom from purposeful race-based discrimination. After all, it is difficult to imagine how an individual could be unaware

(even if grossly negligently so) that he is deliberately treating a person differently because that person is African American. If such a state of mind is possible, it is too subtle for me to grasp. Thus, by "equal treatment," I take it the Barnes means actually receiving the same treatment; that is, regardless of the particular governmental goals being pursued, the end result should be that the Barnes enjoys the same use of its property as is enjoyed by those institutions not governed by African Americans. Under the Barnes's theory, then, a governmental official would violate the Due Process Clause if the person should have known that his or her action would not achieve this equal end result.

■ This proposed standard is obviously more lenient than the prevailing standard under the Equal Protection Clause. Governmental officials are not obligated under the Equal Protection Clause to ensure that their actions do not bear a racially disproportionate impact. The Supreme Court explained in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), that "we have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than another." *Id.* at 242, 96 S.Ct. at 2049. Likewise, in *Personnel Adm'r v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), the Supreme Court concluded that even if the Massachusetts legislature was fully aware that its legislation would have a seriously adverse impact on the opportunities available to women in the State's civil service system, the legislature nonetheless would not violate the Equal Protection Clause absent an invidious intent to bring about that result. *See id.* at 278–79, 99 S.Ct. at 2295–96. Yet here, the Barnes would find such action violative of the Due Process Clause as long as the governmental officials should have been aware that their action would bring about such an unequal result.

It is not obvious why the Due Process Clause should provide a stronger guarantee of equality than the Equal Protection Clause itself does. Although the Supreme Court recognized in *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), that the notion of "due process" embodied in the Fifth Amendment's Due Process Clause includes an "equal protection" component, it did not suggest that the concept of "due process" reaches a broader range of discriminatory conduct than the Equal Protection Clause does. *See id.* at 499, 74 S.Ct. at 694. Subsequent cases have confirmed that the Fifth Amendment's Due Process Clause provides the exact same measure of protection against racial discrimination as the Fourteenth Amendment's Equal Protection Clause does, *see, e.g., Adarand Constructors v. Pena*, 515 U.S. 200, 215–18, 115 S.Ct. 2097, 2106–08, 132 L.Ed.2d 158 (1995), which is obviously to say that it does not provide a greater measure of protection than the Equal Protection Clause does. For the Barnes to prevail on its theory, it would have to show why the concept of "due process" embodied in the Fourteenth Amendment's Due Process Clause should extend greater protection against racial discrimination than the concept of "due process" embodied in the Fifth Amendment's Due Process Clause does, and thus greater protection than the explicit Equal Protection Clause that was enacted alongside the Fourteenth Amendment's Due Process Clause does. The Barnes has not done that here.

The Barnes relies on three cases, all apparently for the proposition that a governmental official violates substantive due process when acting in a grossly negligent manner. None of these cases involved a liberty interest in "equal treatment." In *Metzger v. Osbeck*, 841 F.2d 518 (3d Cir. 1988), the Third Circuit addressed an excessive force claim in which a public school teacher placed his hands around a student's neck, which caused the student to lose consciousness and fall to the ground, breaking his nose in the process. *See id.,* at 519–20. The Third Circuit reversed a grant of summary judgment in favor of the teacher because it concluded that a jury could infer that the teacher intended to injure the student or was substantially certain that injury would result, which would constitute a deprivation of the student's liberty interest in his "personal security." *See id.* at 520–21.

The Third Circuit explicitly stated that it did not need to address whether the teacher would be liable under § 1983 if he had only been recklessly indifferent or grossly negligent in disciplining the student. *See id.* at 520 n. 1.

The Barnes apparently relies on the *Metzger* court's statement in dictum that "when a state actor has 'infringed a liberty interest by intentional conduct, gross negligence, or reckless indifference, . . . the matter is actionable under section 1983.' " *See id.* (quoting *Colburn v. Upper Darby Township*, 838 F.2d 663, 668 (3d Cir.1988)). The case the Third Circuit relied on for the quoted proposition involved a § 1983 claim against various police officers for failing to properly search and supervise a detainee, who later committed suicide in her jail cell with a handgun that she had hidden from the officers when she was initially brought into custody. *See Colburn*, 838 F.2d at 664–65. In analyzing this claim, the Third Circuit in *Colburn* surveyed its precedents involving the obligations custodial officers have under the Due Process Clause to protect prisoners from attacks by other inmates. *See id.* at 667–68. It was in this custodial context, in which a "prisoner is, by virtue of his or her custody, in a special relationship with the custodial authorities and dependent upon them for protection," *id.* at 668 (internal quotes omitted), that the Third Circuit stated that prison officials could be liable for "infring[ing] a liberty interest by intentional conduct, gross negligence, or reckless indifference." *Id.* Furthermore, the Third Circuit explained that it had "not yet had occasion to define 'gross negligence' or distinguish it from 'reckless disregard' or 'reckless indifference' in the civil rights context" and declared that it would be premature to try to draw any such distinction "*[e]ven if* we were convinced that there could be a meaningful distinction between these terms." *See id.* at 670 (emphasis added).

Thus, *Metzger* does not provide any support for the Barnes's claim that a governmental official violates the Due Process Clause by denying equal treatment in an unknowing but grossly negligent manner. Neither of the other two cases the Barnes relies on even involve "grossly negligent" standards of liability, much less a liberty interest in equal treatment.[23]

In conclusion, the Barnes's substantive due process claim depends on the same showing that its claim under the Equal Protection Clause does, which is that the Defen-

---

**23.** In *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592 (3d Cir.1995), the Third Circuit determined that "ownership is a property interest worthy of substantive due process protection" and that "in the context of land use regulation, . . . a landowning plaintiff states a substantive due process claim where he or she alleges that the decision limiting the intended land use was arbitrarily or irrationally reached." *See id.* at 600–01. In the case before it, the Third Circuit reversed the grant of summary judgment in favor of various members of a zoning board because it concluded that a genuine issue existed whether particular zoning actions were motivated by an improper purpose, namely the members' personal financial interest in the matters acted upon. *See id.* at 602.

In *Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685 (3d Cir.1993), the Third Circuit addressed whether the City of Philadelphia violated the substantive due process rights of a corporation leasing a parking garage from the City when the City terminated the lease on the basis that the garage was in "imminent danger of collapse." *See id.* at 692–93. The asserted basis for the due process violation was that the City officials who terminated the lease did not actually believe that the garage was in danger of collapse, but rather used that reason as a pretext for an improper motive, namely the City's economic interest in terminating the lease. *See id.* The Third Circuit reinstated a jury verdict in favor of the corporation because it found that the jury could conclude that the City officials knew of or recklessly disregarded facts indicating that the garage was not in "imminent danger of collapse," from which the jury could infer that the termination was improperly motivated. *See id.* at 697–700. Thus, the Third Circuit's opinion referred only to "reckless disregard," which it defined as ignoring known facts, *see id.* at 693 n. 3, rather than "gross negligence," and moreover, the recklessness itself did not constitute a due process violation, but rather was only circumstantial evidence that the City officials were motivated by an improper—and thus intentional—purpose, which would violate due process.

Thus, neither *DeBlasio* nor *Parkway Garage* support the Barnes's claim that governmental officials violate the Due Process Clause when they deny equal treatment in a grossly negligent manner. Furthermore, even if a "grossly negligent" standard were to apply, as the extensive discussion of the evidence under the Equal Protection Clause section demonstrates, the standard would not be met.

dants' conduct was motivated by a racially discriminatory purpose. Because the Barnes has not offered evidence sufficient to make that showing, the Defendants are entitled to judgment on the Barnes's substantive due process claim.

 In addition to substantive due process, the Barnes asserts other claims under the Due Process Clause. The Barnes claims that the Defendants violated its procedural due process rights by filing a defamation lawsuit against its Trustees in retaliation for the Barnes's having brought the instant civil rights lawsuit. (Doc. # 323, at 37.) Aside from the fact, as discussed below, that the Barnes has not offered sufficient evidence to create a genuine issue whether the defamation suit was retaliatory, it is not apparent how this allegedly retaliatory action would violate the Barnes's procedural due process rights. The Barnes's citation to *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), which discusses only First Amendment rights and not procedural due process, provides no support for this proposition. The Barnes also complains that various aspects of the Defendants' litigation before the Zoning Hearing Board of the December 1995 and August 1996 zoning citations "conflict[ed] with the policies underlying the criminal law principle of double jeopardy" and were "akin to prosecutorial withholding, contrary to *Brady v. Maryland,* [373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ]." (Doc. # 323, at 53.) However that may be, the Barnes does not provide any authority for the proposition that conduct in a civil zoning proceeding violates the Due Process Clause merely because it bears similarities to conduct that would violate the Due Process Clause if undertaken in a criminal prosecution.

In sum, the Barnes has not offered evidence sufficient to create a genuine issue of material fact whether the Defendants deprived it of its rights under the Due Process Clause. The Defendants are entitled to judgment on the Barnes's claims under the Due Process Clause.

## C. FIRST AMENDMENT

The Barnes's last claim under 42 U.S.C. § 1983 is that the Defendants violated the Barnes's First Amendment rights to free speech and to petition the government for redress by filing a lawsuit for defamation against its Trustees in state court. The defamation action alleges that Richard Glanton defamed the Commissioners by stating in November 1995 to a reporter for the *Philadelphia Inquirer* that the Commissioners had engaged in "thinly disguised racism" and that "[t]here is no way you cannot see racism in the way they are treating the Barnes Foundation." (Pl.'s Ex. 182, ¶¶ 84–87.) The Barnes claims that the Defendants filed the defamation action to retaliate against the Barnes for filing the instant civil rights action in this court. (Doc. # 323, at 9, 21, 27, 37–43, 55–58; SMF, ¶¶ 332–346.)

 To show that the Defendants violated its First Amendment rights, the Barnes must show that its conduct was protected by the First Amendment and that the Defendants' actions were motivated by this conduct. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.1994). The First Amendment right to petition the government for redress includes the filing of complaints for relief in court. *See San Filippo v. Bongiovanni,* 30 F.3d 424, 436–37 (3d Cir.1994); *Gagliardi,* 18 F.3d at 194. Thus, the Barnes's act of filing the complaint in the instant action was protected conduct under the First Amendment. With respect to the second prong, however, the Barnes has not produced any evidence to show that the Defendants brought the defamation action against the Barnes's Trustees to retaliate against the Barnes for bringing the instant civil rights suit.

As evidence, the Barnes offers the fact that the defamation action was brought six weeks after the Barnes's civil rights action was filed. (Pl.'s Ex. 182.) The Barnes also points out that the plaintiffs in the defamation action are the same fourteen Commissioners who are defendants in the instant action and that they identified themselves in the complaint as "Commissioners of the

Township of Lower Merion during the relevant time period." (*Id.*) Likewise, the Barnes relies on the fact that the same counsel represents the Commissioners in both the defamation action and the instant action. (*Id.*) Also, the Barnes cites to the deposition testimony of Commissioner Frank Lutz, who stated that he first became aware that his colleagues were planning on bringing the defamation action when he received a letter from the law office of the firm representing the Commissioners in the civil rights suit. (Defs.' Ex. 36.1, at 4–8.) Furthermore, the Barnes offers the deposition testimony of Commissioner Prendergast, who states that he could recall that approximately fifteen to twenty people had spoken to him about the allegedly libelous newspaper article within the preceding year, although he could not recall the names of those individuals except for his law partner. (Defs.' Ex. 47.1, at 211–12.) Finally, the Barnes offers the affidavit of Robert R. Elliott, Esquire, the Barnes's counsel in this action, who states that he witnessed Paul R. Rosen, Esquire, counsel for the Commissioners in both this and the defamation actions, request a court reporter to reprint invoices for deposition transcript bills to add the caption of the instant action to the invoices, alongside the caption for the defamation action. (Pl.'s Ex. 12, ¶ 6.) Elliott states that he heard Rosen explain that the transcript invoices would not be paid until the caption of the federal suit was included.[24] (Pl.'s Ex. 12, ¶ 7.)

▮▮▮ All this evidence shows is that the defamation suit was filed six weeks after the civil rights suit. Although the Barnes makes much of the fact that the defamation action was brought by the same fourteen Commissioners who are the defendant Commissioners in the Barnes's civil rights suit, the defamation action is seeking relief for allegedly libelous statements made about the Commissioners in office during November 1995, who happened to be the same fourteen Commissioners later sued in the Barnes's civil rights suit. Moreover, the Barnes emphasizes the fact that the Commissioners identified themselves as such in the complaint, but given that the allegedly libelous statements do not refer to any of the Commissioners by name but rather are aimed at the group of Commissioners who occupied office in November 1995, in order to obtain relief it would be necessary for the plaintiffs to identify themselves as members of the group allegedly defamed, which in this case happened to be the "Commissioners of the Township of Lower Merion during the relevant time period." The Barnes offers no evidence that the Commissioners brought the action in their capacity as Commissioners of the Township, as opposed to merely identifying themselves as such for purposes relevant to their complaint. Likewise, the fact that the Commissioners retained the same counsel in both actions, just as the Barnes has done, does not show that the Commissioners filed the action with a retaliatory intent. Furthermore, although the Barnes offers Lutz's testimony in an apparent effort to show that the Commissioners were not even aware of the allegedly libelous statements until their counsel in the civil rights action brought it to their attention, Lutz only testified that he first learned of the fact that efforts were being made to file a lawsuit from counsel, not that he first learned of the allegedly libelous statements themselves from counsel. With respect to Commissioner Prendergast's deposition testimony, the fact that he could recall several people discussing the allegedly libelous statements with him does not show that the Commissioners filed the defamation suit in retaliation. Finally,

---

24. The Barnes also claims that the Township has paid some of the expenses incurred by the Commissioners in litigating the defamation action, but the evidence it cites does not support this proposition. Aside from a pageless reference to a deposition, the Barnes offers a document with Township letterhead, entitled "Receiving & Payment Authorization Report," that lists "Spector Gadon & Rosen P.C." as the vendor and sets forth dollar amounts for "Payment of Attorney Fees through July 31, 1996" and "Reimburse-ment of cost for transcripts of Depositions." (Pl.'s Ex. 192.) Nowhere does the document identify what services the attorneys' fees and deposition costs were incurred for, whether for legal services rendered in the instant action or in the defamation action. Nor has the Barnes offered any other evidence that would identify the nature of the services rendered. Accordingly this evidence does not create a genuine issue of material fact.

with respect to the deposition invoices, a review of the record submitted by the parties reveals that, presumably because many of the same parties and the same counsel are involved in both actions, questions about both lawsuits were frequently covered in the same deposition. Thus, without any more evidence about the billing arrangements than what is offered in Elliott's affidavit, the fact that Rosen requested that the *Barnes* caption be added to the deposition transcripts does not show that the Township was paying for the Commissioners' expenses in the defamation action, as opposed to the instant action.

■ Thus, in sum, the Barnes's evidence of retaliation amounts to the proximity in time between the two lawsuits. This evidence, standing alone, does not reasonably support the inference that the Commissioners filed the defamation lawsuit, to which the Barnes is not even a party, in order to retaliate against the Barnes for filing the present civil rights action. By filing the defamation lawsuit, the Commissioners engaged in the protected First Amendment activity of petitioning the government for redress too. Although this right is not absolute, it should not be enjoyed only at the hazard of incurring liability should it be exercised too quickly after the proposed defendants won the race to the courthouse. In conclusion, the Barnes has not offered evidence sufficient to create a genuine issue of material fact whether the individual Commissioners filed the defamation lawsuit in retaliation for the Barnes's civil rights suit. The Defendants are entitled to summary judgment on the Barnes's First Amendment claim.

### III. 42 U.S.C. § 1985(3)

■ The Barnes further contends that the Defendants conspired with its residential neighbors to deprive it of the equal protection of the laws. (Doc. # 323, at 37–38; SMF, ¶¶ 159–166.) As discussed above, the Barnes has not produced sufficient evidence to support a jury verdict that the Defendants actually deprived it of its rights under the Equal Protection Clause. The only evidence the Barnes offers to show that there was a conspiracy to do so is the deposition testimony of Robert Marmon, one of the Barnes's residential neighbors, who testified that he had stated during the Reopening Events Gala that Commissioner Gloria Wolek had told him that the Commissioners were outraged at the Barnes, that they were behind the neighbors, and that they intended to help the neighbors. (Defs.' Ex. 38.2, at 219–20, 235–36.)

This evidence is not sufficient to sustain a jury verdict in the Barnes's favor under § 1985(3). Section 1985(3) provides a cause of action if (1) two or more persons conspire to deprive any person of the equal protection of the laws, (2) one or more of the conspirators perform or cause to be performed any overt act in furtherance of the conspiracy, and (3) that overt act injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States. *See* 42 U.S.C. § 1985(3); *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971); *Bougher v. University of Pittsburgh*, 882 F.2d 74, 79 (3d Cir.1989); *Plasko v. City of Pottsville*, 852 F.Supp. 1258, 1267 (E.D.Pa. 1994).

Here, the Barnes offers evidence only that Commissioner Wolek informed Marmon that the Commissioners intended to help the residential neighbors. This evidence does not reasonably lead to the inference that the Commissioners and the neighbors entered into an agreement to carry out a course of action designed to treat the Barnes differently than similarly situated institutions because of racial animus toward the Barnes's Trustees and Lincoln University.

Furthermore, the Barnes offers no evidence that either the Commissioners or the residential neighbors took any overt acts in furtherance of such a conspiracy or that such overt acts caused the Barnes to be injured or deprived of its rights. As discussed above and in the appendix, the only actions the Barnes challenges in this lawsuit are those of the Defendants. The Barnes has not offered evidence sufficient to show that any of those actions were motivated by a discriminatory purpose, and thus it has not offered evidence that any of those acts, the only overt acts alleged, deprived the Barnes of its rights

under the Equal Protection or Due Process Clauses of the Fourteenth Amendment.

Accordingly, the Barnes has not offered evidence sufficient to create a genuine issue whether the Defendants entered into a conspiracy with the Barnes's residential neighbors to deprive it of the equal protection of the laws. The Defendants are entitled to judgment on the Barnes's claims under 42 U.S.C. § 1985(3).

### IV. 42 U.S.C. § 1981

The Barnes's final claim is that the Defendants violated its right under 42 U.S.C. § 1981 "to make and enforce contracts" the same "as is enjoyed by white citizens." (Doc. # 323, at 33.) The Barnes contends that the Defendants interfered with its right to make contracts with potential visitors to the Foundation by attempting to limit the number of days the Barnes's Gallery is open to the public and the number of visitors it admits to the Gallery. (*Id.*) The Barnes contends that the Defendants have not attempted "to limit attendance at any institutions operated by whites," (*id.*) but provides no evidence in support of this proposition. The Barnes does not offer any other evidence in support of its claim under § 1981 other than the evidence already discussed in connection with its claim under the Equal Protection Clause.

█ The Supreme Court has explained that "[i]n order to prevail under § 1981, a plaintiff must prove purposeful discrimination." *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989), *superseded on other grounds by* Civil Rights Act of 1991, Pub.L. No. 102–166, § 101, 105 Stat. 1071, 1071–72

(codified at 42 U.S.C. § 1981(b)–(c)); *accord Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95 (1st Cir.1996). Because, as has already been discussed, the Barnes has not offered evidence sufficient to show that any of the Defendants' actions were motivated by a discriminatory purpose, its claim under § 1981 fares no better than its claims under § 1983. Accordingly, the Defendants are entitled to judgment on the Barnes's claim under 42 U.S.C. § 1981.

### CONCLUSION

In conclusion, the Barnes has not offered evidence sufficient to create a genuine issue of material fact whether the Defendants' conduct violated the Barnes's rights under the Equal Protection Clause or the Due Process Clause of the Fourteenth Amendment or under §§ 1985(3) or 1981 of Title 42 of the United States Code. The Township and the Commissioners are entitled to judgment as a matter of law.[25] I will therefore grant the Defendants' motions for summary judgment. An order will be entered accordingly.

### APPENDIX

As noted in the attached Memorandum, the bulk of the Barnes's evidence does not involve race, but rather only details various stages of a garden variety zoning dispute between the Barnes and the Township. I have discussed the Barnes's strongest evidence in the Memorandum and found it insufficient to show that any of the Defendants acted with a discriminatory purpose. I analyze the remainder of the Barnes's evidence in this Appendix. In general terms, this evidence concerns the following: (1) the Defendants' requirement that the Barnes obtain

---

**25.** Because the Defendants are entitled to judgment as a matter of law, I need not consider the evidence proffered in support of paragraphs 109–141 or 361–365 of the Barnes's Statement of Material Facts. Paragraphs 109–141 concern the Township's chain of command, which would be relevant to show the liability of the Commissioners and the Township for the actions of Township staff members. Because the Barnes has not offered evidence that any Township official, whether a Commissioner or a low-level staff member, has committed a constitutional violation, I need not consider evidence of the Township's chain of command. Paragraphs 361–365 concern Richard Glanton's authority to file this lawsuit. Because the Defendants raised the issue

of Glanton's authority to file this lawsuit only as a ground for granting their motions for summary judgment, and because I have concluded that the Defendants are entitled to summary judgment on other grounds, I need not address the issue whether Glanton had authority to file this lawsuit or the evidence the Barnes offers in support of that proposition.

Finally, in light of this disposition, I need not consider the Commissioners' claim that even if the Barnes had demonstrated the existence of a genuine issue of material fact, they nonetheless would be entitled to summary judgment on grounds that they are entitled to absolute or qualified immunity. (Doc. # 343, at 71–75.)

approval for a proposed on-site parking lot from the Township's Zoning Hearing Board; (2) the Township's regulatory inspections conducted during the final stages of the Barnes's renovations in the autumn of 1995; (3) the Defendants' interactions with the Barnes before, during, and after the Barnes's Reopening Gala Events in November 1995; and (4) zoning citations issued to the Barnes in December 1995 and August 1996 charging it with violating the Zoning Ordinance by changing its primary use from an educational institution to a museum. As discussed below, none of this evidence provides any support whatsoever for the Barnes's claims that it was treated differently or that the Defendants were motivated by a racially discriminatory purpose.

### a. *The Barnes's On-site Parking Lot*

In preparation for the reopening of the Barnes Foundation after completion of its renovations in the fall of 1995, the Barnes Foundation sought to construct a parking lot on its property to accommodate visitor parking. The Barnes contends that the Township

and Commissioners pressured it to adopt an off-site parking alternative to public street parking and that when negotiations for such off-site parking fell through, the Defendants required the Barnes Foundation to obtain approval for its proposed on-site parking lot from the Lower Merion Zoning Hearing Board. The Barnes contends that both of these actions were unusually harsh measures not taken against similarly situated institutions and that they were motivated by race.

### i. *Off–Site Parking Plan*

 The Barnes contends that the Township, acting through Commissioner James Ettelson, began to pressure the Barnes in the summer of 1995 to require its visitors not to use public street parking and to secure an off-site parking location from which its visitors would be bused to the Barnes's property. (SMF, ¶¶ 144, 146.) Furthermore, the Barnes contends that the Township has not required any other institution or property owner to adopt off-site parking or to otherwise prohibit its visitors from parking on public streets.[26] (SMF, ¶¶ 147, 149–50.)

---

26. In connection with the off-site parking plan, the Barnes also contends (1) that Commissioner Ettelson expressed disappointment to the Township Manager when the plan did not come to fruition, (2) that Commissioner Ettelson had assured the neighbors in late summer 1995 that a parking solution would be found but that the neighbors began to doubt his efficacy in the following two months, (3) that some of the Barnes's residential neighbors secretly requested Episcopal Academy not to lend use of its parking lot to the Barnes, (4) that the off-site parking request was improper because the Barnes had the right to use its own property, and (5) that the Township tolerates brief periods of illegal parking by churchgoers attending religious services. (SMF ¶¶ 145, 148–B, 150, 152, 309.)

None of these allegations create a genuine issue of material fact. First, there is no reason to believe that Commissioner Ettelson would be disappointed only if his request had been improperly motivated. Second, Commissioner Ettelson's assurance to the neighbors and their increasing doubts is equally consistent with a properly and an improperly motivated desire to obtain a parking resolution. Third, the Barnes offers no evidence that any of the Defendants participated in or were aware of the neighbors' secret request of Episcopal Academy, and thus this evidence is not probative of whether the Defendants deprived the Barnes of its equal pro-

tection rights. Fourth, the Barnes cites to no evidence that supports its claims that Commissioner Ettelson's request interfered with its property rights. Finally, if the church parking is offered to show that similarly situated institutions were not required to adopt off-site parking plans, there is no showing that such churches and the Barnes are similarly situated in terms of parking and traffic concerns, and in any case, the existence of street parking does not show that the Township never requested the churches to adopt an off-site parking plan, just as the fact that the Barnes has not adopted an off-site parking plan (and whose visitors still parked on the street following the Township's request, *see* Pl.'s Ex. 223) does not show that it was never requested to do so. Moreover, if the illegal street parking is offered to show that the Township has not required local churches to prohibit their guests from parking on the street, this evidence is still not probative of an unequal application of the laws because, as noted below, the Barnes has not offered any evidence that the Township ever required or requested the Barnes to prohibit its guests from parking on the street either.

In a somewhat related claim, the Barnes contends that the Defendants demanded that it devise a reservation system to control the flow of its visitors and that the Defendants have not made such a demand on any other institution or property owner in Lower Merion. (SMF, ¶ 148.)

All the Barnes's evidence shows is that Commissioner James Ettelson requested the Barnes to adopt an off-site parking plan during the summer of 1995.[27] (Pl.'s Ex. 10, ¶¶ 34–35.) The Barnes contends that this request constituted differential treatment, but the only evidence it offers in support of this contention are three witnesses who would testify that they do not know of any instance in which the Township required an institution to adopt an off-site parking plan. (Pl.'s Ex. 10, ¶ 35; Pl.'s Ex. 6, ¶ 22; Pl.'s Ex. 220, at 374–77.) Even assuming these witnesses could show that they possess such a thorough knowledge of the Township's dealings with all of the other property owners in Lower Merion that they would know of any such instance, had it occurred, which appears doubtful, this evidence would be irrelevant because the fact that the Township had never *required* a property owner to adopt off-site parking would not show that the Township had also never *requested* other property owners to adopt off-site parking. The Barnes itself, after all, was never required to adopt an off-site parking plan, but merely requested to do so.[28]

Thus, the Barnes has offered no evidence from which a jury could infer that Commissioner Ettelson's request constituted an unequal application of the laws, and accordingly this evidence does not create a genuine issue of material fact.

### ii. *Zoning Hearing Board Approval of the Barnes's On–Site Parking Lot*

The Barnes ultimately decided to construct an on-site parking lot. The Township required the Barnes to obtain approval for this parking lot from the Township's Zoning Hearing Board. The Barnes contends that existing law did not require it to go through the Zoning Hearing Board to add an on-site parking lot and that the Township does not require other institutions to undergo the same zoning approval process.[29] (SMF, ¶¶ 310, 312, 329–31.)

The evidence the Barnes offers in support of these claims shows at most that the Township may have had some discretion to review the Barnes's proposed parking lot through a more informal method than the standard Zoning Hearing Board process. The Barnes has not offered any additional evidence to show that the Township exercised this discretion in a racially discriminatory manner.

What the Barnes's evidence shows is that the Township's Zoning officer, Robert Duncan, may have had authority to submit the Barnes's parking lot to review under a procedure known as "rule fourteen," which was described as an informal summary procedure

---

The only evidence the Barnes offers, aside from a pageless reference to a deposition, is a portion of Massaro's affidavit in which he does not even mention a reservation system. Thus, this alleged fact also remains unsupported and does not create a genuine issue of material fact.

27. The Barnes offers no evidence that supports its related claim that the Township requested it to require that its visitors refrain from using public street parking.

28. Furthermore, even if the Barnes could show that no other property owner had been requested to adopt an off-site parking plan, which it has not done, it would still have to show that some other institution presented a similar parking situation before this fact would bear any significance. The Equal Protection Clause only guarantees that the government will treat similarly situated individuals alike, and thus differential treatment is not actionable under the Equal Protection Clause if the individuals impacted were differently situated. *See e.g., Artway v. Attorney Gen.*, 81 F.3d 1235, 1267 (3d Cir.1996) (explaining that the Equal Protection Clause "is not a command that all persons be treated alike but, rather, 'a direction that all persons *similarly situated* should be treated alike'" (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985))). For example, proof that the Township had not requested a residential homeowner to adopt an off-site parking plan would hardly tend to show an unequal application of the laws if the only traffic generated by the homeowner was the coming and going of two family cars ordinarily parked in the homeowner's garage.

29. The Barnes contends that the Township exceeded its authority by imposing "obstacles" to the on-site parking lot, (SMF, ¶ 311), but it cites only to portions of the deposition of Peter F. Kelsen, Esquire, that do not support this proposition. (Defs.' Ex. 28.1, at 18–22, 235–36.) The Barnes also contends that Zoning Officer Duncan "treated the Barnes with special disfavor," (SMF, ¶ 312), but it cites only to a portion of Kelsen's affidavit in which he discusses the neighbors, not Duncan. (Pl.'s Ex. 11, ¶ 15.)

to obtain approval from the Zoning Hearing Board without requiring a lengthy hearing process. (Defs.' Ex. 15.1, at 58–59.) In addition, Duncan testified that he "would sometimes issue a permit" for a "minor exterior" modification to a nonconforming use without requiring the property owner to obtain approval for the modification from the Zoning Hearing Board. (Defs.' Ex. 15.1, at 59–60.)

At best, this evidence shows that the Township's Zoning Officer had the discretion to submit the Barnes's on-site parking lot to a less extensive review process than the standard Zoning Hearing Board review process but declined to do so. Standing by itself, this evidence does not suggest an improper motive. Governmental officials frequently possess some measure of discretionary authority, and it is inherent in the very nature of discretion that it will not always be exercised in the manner most preferred by the affected constituents.

The rest of the evidence the Barnes offers fails to show that the Township acted discriminatorily in sending the Barnes's parking lot proposal to the Township's Zoning Hearing Board. The Barnes would have Peter F. Kelsen, Esquire, testify that in his opinion, the parking lot "did not require any special zoning action" and that the Township undertook "a highly strict and unreasonable interpretation of its rights." (Pl.'s Ex. 11, ¶¶ 7–8.) Kelsen provides absolutely no factual basis to support these conclusions,[30] however, which is a basis for excluding these portions of his

affidavit from consideration on a motion for summary judgment. See Fed.R.Civ.P. 56(e); *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1144 (3d Cir.1990); *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir.1985). Furthermore, Kelsen's testimony would be inadmissible under Federal Rule of Evidence 702 because, without any supporting facts whatsoever, his bald conclusion would be unhelpful to the jury.[31] The function of an expert witness is not simply to draw conclusions, but rather to help the trier of fact understand the evidence and to determine issues of fact by imparting to the trier of fact the benefit of the expert's specialized knowledge, so that the jury can determine, for example, whether the zoning approval process was required or highly unusual. See Fed.R.Evid. 702; 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* §§ 702.02–.03 (Joseph M. McLaughlin ed., 2d ed.1997) (explaining that the basic test for admitting expert testimony under Federal Rule of Evidence 702 is helpfulness to the trier of fact); *cf., e.g., Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir.1992) (concluding that an expert's conclusory assertions about the defendant's state of mind would not be helpful to the jury under Rule 702); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir.1987) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."). Accordingly, this evidence would not be admissible and cannot support

---

**30.** In other portions of his affidavit, Kelsen states that the Barnes's land use is a preexisting, nonconforming land use and that Pennsylvania constitutional law prohibits any abridgement of a preexisting, nonconforming land use or any natural evolution of that use. (Pl.'s Ex. 11, ¶¶ 3–6.) It is unclear whether these statements were intended to support Kelsen's opinion that the Zoning Hearing Board review was unnecessary, but if they were, Kelsen provides no explanation whatsoever of how the Barnes's zoning status is relevant to the question whether a modification in existing use must be reviewed by the Township's Zoning Hearing Board.

For that same reason, Kelsen's statement elsewhere in his affidavit that other institutions have been treated as preexisting nonconforming uses, (Pl.'s Ex. 11, ¶ 9), likewise has no bearing on the propriety of submitting the Barnes's parking lot to the Zoning Hearing Board process.

**31.** The Barnes also cites to a portion of Kelsen's deposition testimony in which he again states that he did not believe that the Barnes's parking lot proposal had to go through the Zoning Hearing Board. (Defs.' Ex. 28.1, at 48–50.) As in his affidavit, he does not provide any explication for why he holds that belief, except to say that it was based on research. Whether opinion testimony is offered in an expert capacity, as the proffer of Kelsen's affidavit suggests, or in a layman's capacity, as the proffer of his deposition suggests, the opinion must at least be helpful to the jury, see Fed.R.Evid. 701; Fed.R.Evid. 701 advisory committee's note ("If ... attempts are made to introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is called for by the rule."), and as explained above, this completely unsupported opinion is not helpful.

**1009**

the Barnes's claim.[32]

The Barnes would also have Kelsen testify that some other institutions in the Township were allowed to construct parking lots without going through the Zoning Hearing Board. (Defs.' Ex. 28.1, at 39–40.) Even assuming that Kelsen has personal knowledge of these facts (which is questionable given his statement that his knowledge was based on his "experience in reviewing The Barnes history"), the Barnes has not offered any evidence of what criteria are relevant to determining whether Zoning Hearing Board approval is necessary, nor has it produced evidence showing that the Barnes was similarly situated in all relevant aspects under those criteria with the other institutions that Kelsen claims did not have to obtain zoning board approval. Thus, this evidence does not show that the Barnes was treated differently at all, much less that it was treated differently because of racial animus toward its Trustees.

Finally, the Barnes would offer a portion of the statement of facts from a judicial opinion to show that in 1987 the Township's Zoning Officer did not require a flower shop to obtain permission from the Zoning Hearing Board before constructing a fifteen-space employee parking lot. (*Merion Park Civic Ass'n v. Zoning Hearing Bd.*, 109 Pa.Cmwlth. 38, 530 A.2d 968, 969–70 (1987).) Civil judgments are inadmissible hearsay. *See. e.g., McKinney v. Galvin*, 701 F.2d 584, 586 n. 5 (6th Cir.1983); 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 803.28[2] (Joseph M. McLaughlin ed., 2d ed.1997); Michael H. Graham, *Federal Practice & Procedure* § 6773, at 726 (interim ed.1992). Noncontested facts recited in the introduction of an opinion, which have not been fully litigated and which do not present the same degree of reliability that a final judgment does, are likewise inadmissible hearsay. *Cf. United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir.1994) (holding that

judicial findings of fact were inadmissible hearsay). Hearsay statements that cannot be made admissible at trial cannot be considered on a motion for summary judgment. *See* Fed.R.Civ.P. 56(e); *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 n. 1 (3d Cir. 1996).

Even if the Barnes were able to overcome these hearsay objections, the Barnes has offered no evidence to show that the Township's zoning procedures have remained unchanged since 1987. Furthermore, even assuming the procedures have remained unchanged, the Barnes again has not offered any evidence of what criteria are relevant to determining whether Zoning Hearing Board approval is necessary, nor has it made any attempt to show that this flower shop's parking lot proposal presented no relevant differences under those criteria from the Barnes's proposed parking lot.

Thus, the Barnes has offered no evidence to show that the Township treated it differently or acted with a racially discriminatory purpose when it required the Barnes to obtain approval from the Township's Zoning Hearing Board for its proposed on-site parking lot. Accordingly, this evidence does not create a genuine issue of material fact.

**b. *The Final Stages of Renovations in Autumn 1995***

The Barnes contends that the Defendants harassed the Barnes in the fall of 1995 by (1) conducting excessive building inspections, (2) issuing an unwarranted tree-cutting citation, (3) conducting an unreasonable final "walkthrough" inspection of the Barnes Foundation, and (4) imposing unusually harsh regulatory prerequisites to erect a temporary tent for the Barnes's Reopening Gala Events. (SMF, ¶¶ 171–201, 203, 205).

**i. *Building Inspections***

The Barnes claims that the Township generally engaged in a harassing campaign of building inspections in October and

---

**32.** Because I conclude that these portions of Kelsen's affidavit would not assist the jury under Federal Rule of Evidence 702 and cannot be considered on a motion for summary judgment under Federal Rule of Civil Procedure 56(e), I need not address the objections of the Township and Commissioners that I should strike Kelsen's affidavit under the Federal Rules of civil Procedure as an untimely expert report. (Doc. # 342, at 17–19; Doc. # 343, at 33–43.)

November 1995, (SMF, ¶¶ 171–73, 175), but its evidence only shows that a building inspector made approximately six unannounced visits in the last two months of construction.[33] (Pl.'s Ex. 10, ¶ 40.) The Barnes provides no additional evidence to show that unannounced inspections are unusual, nor does it offer any evidence to show that the frequency of these inspections was unusual.

Likewise, the Barnes emphasizes the deposition testimony of Township Manager David Latshaw, in which he stated that he probably would have told Township staff members to monitor the Barnes's situation "very closely" during the autumn of 1995, (Defs.' Ex. 35.1, at 130), but the Barnes again offers no additional evidence to show that Latshaw's instructions would have marked a departure from the Township's ordinary standards in monitoring property owners.

Thus, the Barnes has not offered any evidence to show that the Township subjected the Barnes to a different level of regulatory scrutiny or that it did so with a discriminatory purpose. Accordingly, this evidence does not create a genuine issue of material fact.

### ii. *The Stop Work Order*

■ The Barnes contends that the Township, without making any prior investigation, issued an unwarranted "stop work order" on October 19, 1995, in which it demanded that the Barnes cease cutting down dead trees. (SMF, ¶ 174, 176.) All the Barnes's evidence shows is that it received a stop work order for removing trees. (Pl.'s Ex. 60; Pl.'s Exs. 39–41; Pl.'s Exs. 64–65; Defs.' Ex. 32.1, at 27, 30.) The only evidence the Barnes offers to support its claim that the stop work order was issued without investigation is an affidavit of Thomas Massaro, in which he states that the Barnes was cited for tree removal without any contact or investigation, simply

because a neighbor called the Township. (Pl.'s Ex. 10, ¶ 41.) Massaro also states that the Township was not violating any regulation and that the Township, including the staff member issuing the citation, requested no information from the Barnes. (*Id.*)

This portion of Massaro's affidavit does not comply with the requirements of Rule 56(e) because he has provided no indication that he has personal knowledge of any of these matters. Although a certain degree of personal knowledge about the Township's interactions with the Barnes can be inferred from Massaro's selfdescribed position as the Barnes's real estate consultant and liaison with the Township's regulatory personnel, the Township's internal actions are not matters that Massaro would naturally learn of firsthand by virtue of his position with the Barnes. Nor does Massaro's position as a real estate consultant suggest that he was personally present on the grounds at the time the Township official came out to the Barnes Foundation to deliver the stop work order and that he was thus able to observe firsthand whether the Township official actually made any inquiries before issuing the stop work order. Thus, this evidence does not comply with Rule 56(e) and may not be considered on a motion for summary judgment. *See* Fed.R.Civ.P. 56(e); *Hlinka v. Bethlehem Steel Corp.,* 863 F.2d 279, 282–83 (3d Cir. 1988); *Maldonado v. Ramirez,* 757 F.2d 48, 50–51 (3d Cir.1985).

### iii. *Final Inspections and Panic Hardware*

■ The Barnes contends that on October 30, 1995, the Township's Deputy Fire Marshal conducted a final "walk-through" inspection during which he imposed harassing and unreasonable requirements as conditions of obtaining a certificate of occupancy.[34] In

---

**33.** The Barnes also cites to the deposition of Mr. Neely but provides no page references. Instead, the Barnes refers to a "response to question from Mr. Wood, counsel to Commissioners." (SMF, ¶ 173.) None of the references to "wood" in the deposition transcript, as located by its index, lead to testimony that suggests that Mr. Neely rarely makes unannounced inspections.

**34.** In an apparent attempt to show that the Township has not subjected similarly situated

institutions to the same degree of regulatory compliance, the Barnes contends that the Township did not require Episcopal Academy to build 14 parking spaces that were originally imposed as a condition of obtaining approval for a science building wing and that it did not require installation of sprinklers in the Administration Building, although required by the fire code. (SMF, ¶ 107.) The Barnes's evidence does not indicate that applicable regulations required Episcopal to

addition, the Barnes claims that the Deputy Fire Marshal required the Barnes to install a "panic bar" on its public exit doors rather than the "panic button" that the Barnes had installed with the Township's approval earlier in the renovation process. The Barnes contends that the Township has not imposed the panic bar requirement on other similarly situated institutions. (SMF, ¶¶ 177–181, 182–A to 201.)

Turning first to evidence of the final "walk-through" inspection tour, the Barnes's evidence shows that Deputy Fire Marshal Hofstetter stated at the outset of the inspection that the building "will not pass," (Pl.'s Ex. 10, ¶ 43), and that during the inspection, Hofstetter required the Barnes to place a sprinkler in the mechanical room of the elevator, threatened to withhold approval because of a cobweb on a smoke detector in a tool room located in a separate, detached building, and required the Barnes to remove a small box of air filters. (Pl.'s Ex. 10, ¶¶ 43–44.)

Although the Barnes contends that these requirements were arbitrary and unreasonable, it offers no evidence of the applicable regulatory requirements or the criteria ordinarily applied during a fire safety inspection tour. Without any more information than this, it is mere conjecture whether sprinklers are generally required in mechanical elevator rooms or whether the Township imposes the same requirements on other property owners. Likewise, the expression of an opinion that the building "will not pass," without more (such as evidence that Hofstetter knew or believed that the building was in compliance with all applicable requirements), is equally consistent with a proper and improper motive and thus not probative of an equal protection violation. *Cf. eg., Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382 n. 12 (3d Cir.1990) ("[A]n inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."). Thus, this evidence does not show that the Township treated the Barnes differently or that it acted with a discriminatory purpose.

Turning to evidence of the "panic bar" requirement, the Barnes offers evidence that during the October 30, 1995 inspection tour, Hofstetter stated that the Barnes would have to install a panic bar on the main gallery building door, rather than a panic button, (Pl.'s Ex. 10, ¶ 45), a fact the Township does not dispute. (Doc. # 342, Ex. A, ¶ 181.) The Barnes contends that the Township has not required other "large building" owners to install panic hardware, that the Township required the Barnes to install panic hardware that was not fire tested, and that the Township had known for a "substantial" period of time that the Barnes intended to install a panic button rather than a panic bar. The Barnes's evidence provides no support for the first two contentions and does not create a genuine issue of material fact with respect to the third contention.

As for its claim that the Township does not require other "large buildings" to install panic hardware, (SMF, ¶ 182–A), the Barnes offers only photocopies of photographs that purport to depict the doorways of various institutions, such as the Fresh Fields supermarket in West Lancaster and the Bryn Mawr Presbyterian Church.[35] (Defs.' Exs. 24.1, 33.1.) The reproduction quality of these photocopies is poor, however, and it is difficult to make out much detail. Moreover, the Barnes has not identified the distinguishing characteristics of panic hardware or pointed to any deposition testimony or affidavit stating whether the doors depicted in the photographs are equipped with panic hardware. Thus, the Barnes has produced no evidence that supports its claim that the Township has not required other "large building" owners to install panic hardware.

As for its claim that Hofstetter required the Barnes to install a panic bar that was not

---

construct the parking spaces or to install the sprinklers, (Defs.' Ex. 6.1, at 64), and thus Episcopal's failure to do so does not give rise to the inference that the Township waived regulatory requirements applicable to Episcopal.

**35.** All of the other evidence the Barnes cites in support of this claim tends to show that the Township generally requires that institutions with large public capacity to install panic hardware. (Pl.'s Ex. 7, ¶ 12; Defs.' Ex. 24.1, at 10, 76, 84–89, 97, 122–23.)

fire tested or approved, the Barnes's evidence provides no support for this claim either. The Barnes offers the affidavit of Thomas Massaro, in which he does not assert that Hofstetter tried to require the Barnes to install untested equipment, but rather only suggests that the exigencies of the situation would require the Barnes to install untested equipment if it was to comply with the "immediate requirement to impose a panic bar." (Pl.'s Ex. 10, ¶ 47.) Nowhere does the Barnes produce evidence that Hofstetter required immediate installation, however.[36] Thus, even assuming that Massaro is correct in his assessment that immediate installation would have required untested equipment, the Barnes has offered no evidence that Hofstetter wanted the panic bar installed immediately and thus no basis from which to infer that Hofstetter tried to force the Barnes to install unsafe, untested equipment (which in any case would still require evidence that Hofstetter himself was aware or believed that the requirement could not be met immediately without use of untested equipment).

The Barnes also points to the deposition testimony of Hofstetter, in which he states that he believes he saw at some unspecified time a letter in which the Barnes expressed a desire to install a "non-standard type piece of hardware." (Defs.' Ex. 24.1, at 60.) Nowhere does Hofstetter explain whether "non-standard" equates with untested hardware. The Barnes further cites to portions of Hofstetter's deposition in which Hofstetter was asked whether he recalled any discussions "that if a piece of equipment was manufactured just specially for that one set of doors, it would not have been fire tested," to which he replied, "[t]hat's right, that's correct." (Defs.' Ex. 24.1, at 72–73.) At most, this evidence shows that at some unspecified

point in time, Hofstetter received information that if the Barnes installed specially manufactured equipment, it would not have been fire tested. The Barnes offers no evidence of when these discussions took place or of how the Township responded when it was informed of the problems that could arise if the Barnes were to install specially manufactured equipment.

Finally, aside from Massaro's affidavit and Hofstetter's deposition, the only other evidence the Barnes offers in support of its untested hardware claim are two letters, neither of which discusses fire testing in any way. (Pl.'s Ex. 149; Pl.'s Ex. 153.) Thus, the Barnes has produced no evidence to show that Hofstetter required the Barnes to install panic hardware that was not fire-tested.

As for the Barnes's claim that the Township had been aware for a "substantial period" that the Barnes intended to install a panic button rather than a panic bar, (SMF, ¶¶ 187, 187–A), the Barnes offers the affidavit of Thomas Edward Barnhart, in which he states that during the summer of 1995, Hofstetter disapproved a "keyed manual override system" in favor of a "button device panic release." [37] (Pl.'s Ex. 19, ¶¶ 2–3.) Although this evidence would tend to support the Barnes's claim that the Township was aware that the Barnes planned to install a panic button, without more evidence about the applicable regulatory requirements in effect during the two time periods and the relevant conditions of the building under those requirements at the two different stages of the renovation process, this evidence is not probative of improper motivation.

Thus, in conclusion, the Barnes has produced no evidence to show that the Township treated the Barnes any differently or acted with a racially discriminatory purpose when

---

36. Indeed, the Barnes acknowledges that it received the certificate of occupancy on November 8, 1995, even though it had not installed the panic bar, and that even a year and a half later, it still had not installed the panic bar. (Defs.' Ex. 24.1, at 69 (statement of Barnes's counsel); Pl.'s Ex. 10, ¶ 50.) Furthermore, the Barnes offers as evidence a letter from Barnes representative Edward A. Barnhart to Hofstetter, dated November 30, 1995, in which Barnhart acknowledges a conversation between himself and Hofstetter in which "[i]t was stated that no specific stipulation was being made by the Township with regard to required implementation period for these alterations." (Pl.'s Ex. 149.)

37. The Barnes also offers a document labeled "Miscellaneous Activity Report," (Pl.'s Ex. 44), but nowhere does the this document mention a panic button, a panic bar, or any other kind of panic hardware.

it conducted the final inspections.[38] Accordingly, these facts do not create a genuine issue of material fact.

#### iv. *The Barnes's Temporary Tent*

■ In preparation for the Reopening Gala Events, the Barnes set up a temporary tent on its grounds to accommodate its anticipated guests. The Barnes claims that the Defendants imposed unusually burdensome requirements on the Barnes's maintenance of the temporary tent, including mandatory reinstallation of the electrical wiring, venting of heating equipment from outside the tent, and installation of smoke detectors. (SMF, ¶ 205.)

As evidence, the Barnes offers the affidavit of Thomas Massaro, in which he states that the Township required the Barnes to "tear out all the electrical installation" in the tent, to rebuild the temporary main electrical board, to use different equipment, to heat the tent through heat ducts from outside rather than producing it inside, and to install more smoke detectors in the tent, after the Barnes had installed some detectors, even though an inspector had earlier stated that no detectors were necessary.[39] (Pl.'s Ex. 10, ¶ 52.) Furthermore, Massaro states that Deputy Fire Marshal Hofstetter returned on November 11, 1995, after the tent had already been approved, and "looked through it again" before the major dinner event scheduled for that evening. (*Id.*)

The Barnes does not provide any evidence, however, of what applicable regulatory requirements govern the erection of temporary tents or how the Township has applied these requirements against similarly situated property owners. Accordingly, this evidence does not create a genuine issue of material fact.

#### c. *November 1995: The Reopening Gala Events. the November 15 Commissioners' Meeting, and Temporary Parking Permission*

In November 1995, the Barnes reopened the newly renovated Foundation to the public. In the several days before its reopening, the Barnes held a series of special celebratory events, including a dinner for 500 guests, which the Barnes refers to collectively as the Reopening Gala Events. Between the conclusion of the Reopening Gala Events and the Barnes's official reopening, the Township's Board of Commissioners held a public meeting in which, following a period of comment from several neighbors about the Barnes, the Commissioners adopted a resolution requesting the Barnes to postpone its reopening until satisfactory plans had been devised to handle the anticipated crowds, parking, and traffic. (Doc. # 289, ¶¶ 265–66; SMF, 283; Pl.'s Ex. 123, at 28–29; Pl.'s Ex. 124; Defs.' Ex. 47.1, Ex. 3, at 28–29.)

The Barnes contends that this resolution, as well as a number of other actions taken by the Defendants before, during, and after the Reopening Gala Events, were motivated by racial animus toward the Barnes's African American Trustees and toward Lincoln University, the entity authorized to appoint a majority of the Barnes's trustees. (SMF, ¶¶ 104–105, 212–303, 305–307.) As explained below, the Barnes's evidence does not support this claim and does not create a genuine issue of material fact.

#### i. *Township Manager Latshaw's November 9.1995 Letter*

■ The Barnes's first claim is that the Defendants falsely charged the Barnes with failing either to provide advance notice of or to plan for its Reopening Gala Events, even though they did have notice of the Events and knew the planning was satisfactory. As

---

**38.** The balance of the Barnes's citations to Hofstetter's deposition testimony simply do not provide any support for the proposition that the Township treated the Barnes differently or acted with a discriminatory purpose when it required the Barnes to install panic hardware. (Defs.' Ex. 24.1, at 51–52, 60, 64–66, 69–71.)

**39.** Massaro's statement that he "believed" that the tent inspection "was intended to threaten to deny the Barnes approval to use the tent" does not satisfy Rule 56(e)'s requirements that an affidavit be made on personal knowledge, set forth admissible facts, and affirmatively show the affiant's competence to testify to the matters asserted. *See* Fed.R.Civ.P. 56(e); *Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 282 (3d Cir.1988).

evidence, the Barnes offers the November 9, 1995 letter in which Township Manager David Latshaw writes that following Commissioner Ettelson's briefing of the "contemplated plans for the special events and re-opening of the Barnes to the public," he had been "asked to convey to you the serious concerns and general dismay the Board has with these plans." (Pl.'s Ex. 103, at 1.) He explains that "only three days prior to your considerable opening events, has the Board and community learned of the extent of your plans." (*Id.*) In the body of the letter, Latshaw describes perceived deficiencies in the Barnes's plans to handle anticipated traffic and parking concerns during the Reopening Gala Events, recommends certain measures to adopt, and also comments on the Barnes's subsequent opening to the public. (*Id.* at 1–3.) Latshaw concludes by expressing hope that through cooperation "workable solutions can be achieved," but that "[f]ailing that, the Township will use any and all means at its disposal to achieve resolutions compatible with the overall interest of the community of which you are a part." (*Id.* at 3.)

In an effort to show that the Township's reasons were pretextual, the Barnes offers the affidavit of Fred Stein, who states that he was responsible for planning the Reopening Gala Events. (Pl.'s Ex. 9, ¶ 2.) Stein states that the "planning involved was extensive," including plans for security and parking, and that when he assumed responsibility for overseeing the events two months before the Reopening Gala Events were scheduled to occur, his "first call was to Police Chief Daly to tell him about the events and my planning work on them," who then "put me in touch with staff." (Pl.'s Ex. 9, ¶¶ 3–4.) Stein does not explain what information he gave the staff about the events, nor whether he kept the staff updated about the plans throughout the following two months.

Stein's proffered testimony would of course show that the Township was given advance notice that the Barnes planned to hold some kind of special event in November to mark the reopening of the Foundation to the public, but Latshaw's November 9, 1995 letter does not claim inadequate notice of the fact that the Barnes intended to hold the Reopening Gala Events, but rather only about the "extent of your plans."[40] Furthermore, Stein's generalized statement that the "planning involved was extensive" does not show that the Defendants were improperly motivated when they asserted that the Barnes's plans were unsatisfactory. Even granting the Barnes the inference that what was "extensive" was sufficient to satisfy all of the Township's concerns, merely showing that the Defendants were in fact wrong when they declared the plans inadequate does not permit the inference of intentional discrimination. As the Third Circuit explained in the employment discrimination context, "[t]o discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *See Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994). Instead, the plaintiff must move beyond the mere fact of mistake to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* (citation omitted) (alteration in original) (internal quotation omitted). The Barnes has not done that here. Accordingly, this evidence does not create a genuine issue of material fact.[41]

---

**40.** Likewise, the Barnes's evidence that the *Philadelphia Inquirer* ran a story in mid-October that reported the Barnes's plan to hold a 500–person dinner for a "gala reopening" in November if approval were obtained in state court, (Pl.'s Ex. 84), an article which the Barnes does not even attempt to show any of the Defendants were aware of, would at best show that the Defendants had advance notice of the Barnes's plans to hold the Reopening Gala Events, a fact Latshaw's letter does not purport to disclaim.

**41.** Because Stein's affidavit would not create a genuine issue of material fact even if it were admitted, I need not address the Township's objection that Stein's affidavit should not be considered because the Barnes did not timely disclose Stein as a fact witness under the Federal Rules of Civil Procedure. (Doc. # 342, at 31.)

### ii. The November 9, 1995 Meeting

The Barnes's next claim is that during a meeting held between Township officials and Barnes representatives on November 9, 1995, the Barnes was treated more harshly than the Township treats other similarly situated institutions. (SMF, ¶¶ 232–33.) As evidence, the Barnes offers the deposition testimony of Peter F. Kelsen, Esquire, the Barnes's zoning counsel, who states that he "became more aware as we got closer to November 9 of 1995, that The Barnes was not being treated equally and in a manner consistent from a land use standpoint with regard to other institutional uses." (Defs.' Ex. 28.1, at 122.) He also testifies that the Township's demands during the November 9, 1995 meeting were "heavy handed and bordered on the outrageous." (Defs.' Ex. 28.1, at 134.) In neither case does he explain what facts he bases these assessments on, and thus these opinions are not helpful to the trier of fact. See Fed.R.Evid. 701; Fed. R.Evid. 701 advisory committee's note ("If . . . attempts are made to introduce meaningless assertions which amount to little more

than choosing up sides, exclusion for lack of helpfulness is called for by the rule.").

Kelsen also testifies that to his knowledge, the Township has not requested Episcopal Academy to provide the same information to the Township when it holds football games or homecoming events that the Township requested of the Barnes during the November 9, 1995 meeting. (Defs.' Ex. 28.1, at 134.) When asked how he knew this last fact, Kelsen testified that he "gathered" it from his discussions with Township officials in which he asked them if they requested the same information, "and I believe my recollection is I was told, no, they don't." (Id., at 134–35.) Even were Kelsen's recollection certain enough to show that Township officials do not request the same level of information from Episcopal Academy,[42] the Barnes still has not shown that Episcopal's football games, which are recurring events that may share a very different history of institutional cooperation and a long-settled agreement on appropriate parking and traffic arrangements, are comparable to the Barnes's unprecedented Reopening Gala Events. Thus, this evidence does not create a genuine issue of material fact.

---

**42.** Assuming such a level of certainty, then the Barnes's claim that Episcopal generates far greater traffic, (SMF, ¶ 233), would presumably be offered to show that the Barnes was treated differently in being requested to provide more information about its traffic-generating events than Episcopal. The evidence the Barnes cites in support of its claim fails, however, to show that Episcopal's football games pose a greater traffic concern than the Barnes's Reopening Gala Events were anticipated to pose.

The Barnes offers the affidavit of Thomas Henry Massaro, who states that he conducted a "traffic count" of Episcopal's traffic on "four different days believed to be typical days." (Pl.'s Ex. 10, ¶ 68.) He states that Episcopal averaged between 2600 and 2900 car trips and 50 to 60 bus trips in a 12–hour period between 7:00 a.m. and 7:00 p.m., and that the Barnes's traffic "is insignificant by comparison." (Id.)

Massaro does not explain the method by which he conducted this "traffic count" and provides no documentation to demonstrate how he arrived at the study's results. Thus, he does not provide any basis by which to determine whether the "traffic count" study is based on a reliable methodology and thus whether it would be "helpful" to the trier of fact. See Fed.R.Evid.

702; In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 743 (3d Cir.1994) ("[A]dmissibility under Rule 702 is governed by [Federal] Rule [of Evidence] 104(a), which requires the judge to conduct preliminary factfinding, to make a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid' . . . ." (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993))). Nor does he explain when he conducted this study or how he determined what were "typical days." Furthermore, he provides no comparable traffic count for the Barnes's traffic whatsoever, nor does he provide any information about the traffic generated by the Barnes's Reopening Gala Events or what the parties anticipated beforehand. Finally, his study does not analyze traffic volume in any segments smaller than daily units. Even assuming his study showed that Episcopal generates more traffic through the course of the day than the Barnes does, this fact does not show that Episcopal generates greater traffic at any particular time than the Defendants anticipated would occur when 500 guests were expected to arrive for the Barnes's Reopening Gala dinner. Thus, Massaro's "traffic count" is not helpful in demonstrating differential treatment and does not create a genuine issue of fact.

### iii. *Traffic Plans for the Reopening Gala Events*

The Barnes's next claim is that on the night of the Barnes's 500–guest dinner, Township police abandoned the Barnes's traffic plan, which had been agreed upon earlier, in favor of an alternate plan that Barnes representatives had told police would cause gridlock, and that subsequently, traffic gridlock did occur. The Barnes's evidence shows that the Barnes adopted, and discussed with the Township's Police Department, a traffic plan in which guests would exit their cars on Latches Lane in front of the Barnes's gate, and a valet parker would then drive the car down the street to Episcopal Academy's parking lot. (Pl.'s Ex. 9, ¶ 5; Pl.'s Ex. 10, ¶¶ 57, 59.) The police officials originally favored a plan in which the guests would drive onto the Barnes's property before handing their cars over to the valet parkers, but after the Barnes's representatives objected that this plan would result in traffic congestion, the police officials agreed to use the Barnes's plan. (Pl.'s Ex. 9, ¶ 5; Pl.'s Ex. 10, ¶ 59.) Further, the Barnes offers evidence that on the night of the dinner, after a line of cars began to form, the police officers decided to revert back to the police officials' preferred plan and directed the Barnes's guests onto the Barnes's property before handing their cars over to the valet parkers. (Pl.'s Ex. 9, ¶ 9; Pl.'s Ex. 10, ¶ 63.) Finally, the Barnes offers evidence that following the change in plans, many traffic jams developed (Pl.'s Ex. 10, ¶ 65.).

All this evidence shows is that the Barnes and the police disagreed about the best parking plan, that the police officials originally agreed to use the Barnes's plan but later changed their mind as the guests began to arrive and lines of cars began to form on the evening of the dinner, and that traffic jams developed on Latches Lane. The development of traffic congestion may show that the Barnes was correct in its assessment that the police officials' plan would create traffic jams, but it has not shown that its plan would have avoided the same or even greater gridlock. Moreover, the Barnes has offered no evidence to show that the police officers direct-

ing traffic on the night of the dinner chose one plan over the other for the purpose of increasing traffic congestion in order to harass the Barnes, or that they were doing so on the instruction of the Commissioners or the Township official possessing final authority for the police officer's actions. *Cf. Pembaur v. City of Cincinnati,* 475 U.S. 469, 471, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). Thus, this evidence does not create a genuine issue of material fact.

### iv. *The November 15, 1995 Commissioners' Meeting and the Resolution*

The Barnes claims that although the Commissioners professed to hold a neutral discussion of the Barnes's reopening during the November 15, 1995 Commissioners' meeting, they had already agreed beforehand to adopt a formal resolution against the Barnes. Furthermore, the Barnes claims that the adoption of this kind of resolution is unusual in the Township and that it was adopted for the unstated purpose of coercing the Barnes into adopting an off-site parking plan. (SMF, ¶¶ 269–282.) The evidence the Barnes cites, however, does not support these claims.

The Barnes's evidence shows that at the conclusion of the public meeting on November 15, 1995, all of the Commissioners present, with the exception of Commissioner Silver who abstained, voted in favor of a resolution introduced by Commissioner Ettelson, which read in relevant part that

> the members of the Board of Commissioners of the Township of Lower Merion do hereby formally request that appropriate officials of the Barnes postpone indefinitely the reopening of the facility until such time as firm plans have been established and reviewed with the Township in order to manage and maintain effective crowd control, adequate parking, and the traffic volume associated with the reopening . . .

(Pl.'s Ex. 124; Pl.'s Ex. 123, at 28–29.) The Barnes offers evidence that this resolution was prepared before the meeting by Township Manager David Latshaw, who had been instructed by Commissioner Ettelson to draft a resolution requesting the Barnes to postpone its scheduled reopening to the public.

(Defs.' Ex. 35.1, at 115–16, 126–27.) Furthermore, the Barnes offers evidence that a draft of this resolution was passed out to the Commissioners before the meeting and that no changes were requested. (Defs.' Ex. 35.1, at 119–20.) The Barnes also offers the deposition testimony of Commissioner James J. Prendergast in which he stated that resolutions are not everyday occurrences, but that they are passed regularly, and that although the resolution respecting the Barnes was more formal, the Township often requests private entities to undertake some kind of voluntary action. (Defs.' Ex. 47.1, at 107–08.) Commissioner Prendergast testified that he was trying to decide what course of action to take during the November 15, 1995 meeting and that he was persuaded both by the comments of the neighbors who spoke at the meeting and by the absence of any representatives from the Barnes. (Defs.' Ex. 47.1, at 82.) Commissioner Prendergast also testified that in voting for the resolution, he expected the Barnes to postpone the Foundation's reopening to the public, and he stated that the resolution was an effort to get the Barnes to "address the problem in a realistic manner." (Defs.' Ex. 47.1, at 184–86.) Finally, the Barnes offers evidence that the Commissioners generally supported Commissioner Ettelson's handling of the situation with the Barnes.[43] (Defs.' Ex. 35.1, at 178–79.)

None of this evidence shows that any agreement was reached before the meeting, that the resolution was an unusual measure, or that it was adopted with the goal of coercing the Barnes into adopting an off-site parking lot. Thus, this evidence does not support the Barnes's claims and does not create a genuine issue of material fact.

### v. The November 30, 1995 Meeting

Next, the Barnes claims that the Defendants obstructed settlement efforts between the Barnes and its neighbors during a meeting held on November 30, 1995. As evidence, the Barnes cites to the deposition testimony of Peter F. Kelsen, Esquire, the Barnes's zoning counsel, who testified that he arranged a meeting on November 30, 1995 with the residential neighbors' counsel for what he hoped would be a zoning settlement conference. (Defs.' Ex. 28.1, at 187–88.) Furthermore, he testified that he asked the neighbors' counsel whether the presence of Township officials might change the dynamics of settlement negotiations in a detrimental way. (Defs.' Ex. 28.1, at 188.) Finally, he testified that he believed the presence of Commissioners Ettelson and Rosenthal and Township officials Robert Duncan and David Latshaw at the meeting on November 30, 1995 did in fact lead to a contentious meeting. (Defs.' Ex. 28.1, at 187–88.) Although the settlement meeting may not have turned out as hoped, this evidence hardly shows that the Defendants deliberately tried to make the meeting contentious or otherwise obstruct the settlement negotiations, much less that they did so out of racial animus. Thus, this evidence does not create a genuine issue of material fact.

### vi. Temporary Parking Permission

Finally, the Barnes claims that after the completion of the Reopening Gala Events, the Township revoked the Barnes's temporary permission to park vehicles on its property and that the Township refused to grant further temporary parking permission

---

**43.** The Barnes claims that the Barnes Foundation was not on the meeting's regular agenda, but the only evidence the Barnes relies on in support of this claim is found in a deposition taken on May 5, 1997, (Pl.'s Ex. 220, at 380), nearly a month after the close of discovery in this case. (Order of February 7, 1997, ¶ 1 (document # 201).) In any case, the Barnes offers no evidence of the procedure ordinarily followed by the Commissioners in selecting topics of discussion for a public meeting, nor of what impact the fact that the Barnes was not on the regular agenda would have in determining whether representatives of the Barnes had notice that the Founda-

tion might be discussed at the meeting. Thus, this evidence would not create a genuine issue even if admitted.

The Barnes also claims that Commissioner Prendergast admitted that the resolution was actually intended to coerce the Barnes into adopting an off-site parking plan, (SMF, ¶ 279), but the evidence it cites does not support this fact. Rather, the Barnes cites a portion of Commissioner Prendergast's deposition in which he does not discuss the resolution, but instead describes Commissioner Ettelson's earlier efforts to find additional parking and to devise a reservations system. (Defs.' Ex. 47.1, at 188–89.)

while the Barnes's application for a permanent parking lot was pending before the Township's Zoning Hearing Board.[44]

As evidence, the Barnes offers a letter from Township Superintendent of Police Joseph J. Daly to President Richard H. Glanton, dated November 15, 1995, in which Daly writes that "as an emergency measure, temporary permission was granted for the use of a portion of the Foundation grounds to be used as a parking lot for the opening events only," and that "[a]s these events have concluded, this letter will serve as notice that the temporary permission to utilize any unimproved portions of the grounds for the parking of vehicles is hereby revoked." (Pl.'s Ex. 122.) In addition, the Barnes offers the deposition testimony of Peter F. Kelsen, Esquire, in which he testifies that it was his "feeling" that Township regulations would permit the Township to grant the Barnes temporary parking permission during the

pendency of the Zoning Hearing Board proceedings. (Defs.' Ex. 28.1, at 223–24.) Kelsen also testified that the Township had the ability to structure its zoning regulations to permit a landowner to employ a given land use during the pendency of the approval process. (Defs.' Ex. 28.1, at 225–26.) Finally, he testified that Township officials had told him that under Township regulations the Barnes could not operate a temporary unpaved parking lot and that he did not know why they said that. (Defs.' Ex. 28.1, at 220–21.)

The Barnes does not offer any evidence to support Kelsen's unexplained belief that the Township had authority to grant temporary parking permission, nor does it offer any evidence of whether similarly situated institutions have been granted such temporary permission.[45] Without any more information than this, the trier of fact has no basis by which it can determine whether the denial of

---

44. The Barnes also claims that although the Township granted temporary parking permission for the Reopening Gala Events, it did not do so sufficiently ahead of time to allow the Barnes to prepare the lot for use during the Reopening Gala Events, and that the permission was thus useless as a practical matter. (SMF, ¶ 305.) It offers the deposition testimony of Peter Kelsen, in which he states that by the time the Barnes received the parking permission, they were not able to gravel the proposed parking area, and that because of rainy weather conditions on the night they planned to use the lot, they were not able to park vehicles on the lot. (Defs.' Ex. 28.1, at 221–22.) The Barnes offers no evidence, however, that the Township knew of the Barnes's desire or need for temporary parking at an earlier time when the lot could have been adequately prepared but that it deliberately postponed granting such permission until it believed that the Barnes would be unable to make use of the temporary parking permission. Aside from Kelsen's testimony, the only evidence the Barnes offers is Daly's November 15, 1995 letter, discussed below, in which he writes that Township officials did not become aware until November 6, 1995 of the state of affairs with respect to the Reopening Gala Events and the planning therefore, and that an emergency meeting was held shortly thereafter, at which time, the temporary parking permission was granted "as an emergency measure." (Pl.'s Ex. 122.) Thus, this claim remains unsupported and does not create a genuine issue of material fact.

45. The Barnes claims that the Township allows Episcopal Academy, St. Joseph's University, and

Akiba Hebrew Academy to provide parking for their guests on their lawns or other unpaved areas of their properties. (SMF, ¶¶ 104–105.) Whether this asserted fact is even relevant is questionable because the Barnes has not offered any evidence to show that the Township's denial of temporary parking permission was based on the nature of the lot as an unpaved lot rather than on the fact that the Barnes contemplated any kind of parking on the property, paved or unpaved, before obtaining approval for permanent on-site parking from the Township's Zoning Hearing Board.

In any case, the evidence the Barnes offers in support of its claim that the Township allows unpaved parking at Episcopal and similar institutions does not support its claim. The Barnes offers the affidavit of Thomas Henry Massaro, who states that he has often seen cars parked on the lawn or in fire lanes at Episcopal Academy, St. Joseph's University, and Akiba Hebrew Academy. (Pl.'s Ex. 10, ¶ 66.) This evidence is equally consistent with Township approval or illegal parking and thus is not probative of whether the Township actually approved the use of Episcopal's lawns and fire lanes for guest parking. The only other evidence the Barnes offers is the deposition testimony of the Township's Police Chief, Joseph J. Daly, who testified that Township zoning regulations do not "allow people to park cars all over their properties" and that the zoning department had enforced such regulations against parking on lawns. (Defs.' Ex. 13.1, at 125.)

temporary parking was unusual or routine, or whether it was motivated by a proper or improper purpose. Accordingly, this evidence does not create a genuine issue of material fact.

In conclusion, then, the evidence the Barnes offers with respect to the Defendants' conduct before, during, and after the Reopening Gala Events in November 1995 does not create a genuine issue of material fact whether the Defendants treated the Barnes any differently than other institutions or whether their conduct was motivated by a racially discriminatory purpose.

### d. *The December 1995 and August 1996 Zoning Citations*

■ On December 13, 1995, the Township's Zoning Officer issued a zoning citation to the Barnes, charging the Barnes with changing its primary use from an educational institution to a museum, in violation of the Township's Zoning Ordinance. On August 6, 1996, the Township withdrew the December 13, 1995 zoning citation, the Barnes's appeal of which was still pending before the Township's Zoning Hearing Board, and issued a new zoning citation on the same day, again charging the Barnes with operating a prohibited museum use. (SMF, ¶¶ 313–316; Doc. # 289, ¶ 299, 304–305; Doc. # 290; Defs.' Ex. 20.5, Ex. 39, at 1–3.) The Barnes contends that the Township has not issued zoning citations to similarly situated institutions when they have undergone similar changes in visitation or use and that the issuance of these zoning citations was racially motivated. (SMF, ¶¶ 105, 108, 313–21; Doc. # 323, at 24, 26–27, 49–55.) As discussed below, the evi-

dence the Barnes cites does not support these claims and does not create a genuine issue of material fact.

■ To show that the Township has not issued zoning citations to similarly situated institutions when they have undergone similar changes in use, the Barnes offers the affidavit of Peter F. Kelsen, Esquire, the Barnes's zoning counsel.[46] In his affidavit, Kelsen states that the Township has not issued zoning citations to other educational institutions when they "have developed massive increases, and even instituted new uses." (Pl.'s Ex. 11, ¶ 18.) He cites as examples the "addition of a summer camp by Episcopal Academy, the establishment of a computer use at Saint Joes, the development of doctors offices as an independent as a major [sic] business at Lankaneu Hospital, and the development of additional recreational and other activities at Episcopal and other institutions." (*Id.*)

Kelsen provides no indication in his affidavit that he has the personal knowledge required by Rule 56(e) about the changes in use at Episcopal Academy, St. Joseph's University, or Lankaneu Hospital or of how the Township responded to those changes. Although personal knowledge can be inferred from the nature of the affiant's position under certain circumstances, *see, e.g., Barthelemy v. Air Lines Pilots Ass'n,* 897 F.2d 999, 1018 (9th Cir.1990) (per curiam), Kelsen's status as a zoning attorney for the Barnes, standing alone, does not support the inference that he is also personally familiar with the zoning history of Episcopal Academy, St. Joseph's University, and Lankaneu Hospital. Moreover, Kelsen testified in his deposition

---

**46.** The rest of the evidence the barnes cites in support of its claim of differential treatment does not involve changes in use by similarly situated institutions. In its memorandum of law, the Barnes claims that Episcopal Academy, Lankenau Hospital, Akiba Academy, St. Joseph University, and Villanova University all changed their activities without being required to obtain approval from the Zoning Hearing Board, (Doc. # 323, at 54–55), but none of the supporting citations (SMF ¶¶ 31–105 and Pl.'s Ex. 170) even mention these institutions, with the exception of SMF ¶¶ 103–105 regarding Episcopal Academy and St. Joseph's University, which are completely unsupported with any citations to the record,

and SMF ¶¶ 52–61 and Pl.'s Ex. 170, which deal with Villanova University. The Barnes contends that Villanova was allowed to change its use by implementing a bus service for students without having to obtain permission from the Zoning Hearing Board, (doc. # 323, at 55), but none of the evidence it cites supports this claim. The rest of the paragraphs cited in support of the Barnes's claim of differential treatment do not concern other institutions' changes in use or the zoning consequences of those changes, but rather such issues as the unsuccessful attempt to change the zoning classification of South Ardmore or a dispute over the use of public basketball courts in Bala Cynwyd.

that he has not represented any institutions in Lower Merion other than the Barnes and that his other previous representations in Lower Merion involved private developers. (Defs.' Ex. 28.1, at 241–42.) Accordingly, because he has not shown affirmatively that he has personal knowledge and would be competent to testify about the Township's responses to changes in use at Episcopal Academy, St. Joseph's University, and Lankaneu Hospital, this evidence does not comply with the requirements of Rule 56(e) and cannot be considered on a motion for summary judgment.[47] *See* Fed.R.Civ.P. 56(e); *Hlinka v. Bethlehem Steel Corp.,* 863 F.2d 279, 282–83 (3d Cir.1988); *Maldonado v. Ramirez,* 757 F.2d 48, 50–51 (3d Cir.1985).

Next, the Barnes claims that the Township's asserted reasons for issuing the December 1995 zoning citation were pretextual. As evidence, the Barnes cites again to the affidavit of Peter F. Kelsen, Esquire, in which he states that he "attempted to communicate to the Township" that its concern "about the Barnes' land use going beyond its pre-existing non-conforming use" was "entirely inappropriate and unfounded." (Pl.'s Ex. 11, ¶ 16.) Kelsen states that he was "continually met by a misstatement that the Barnes was attempting to increase its visitation beyond that 'allowed' by the 1963 Court settlement." (*Id.*) Kelsen states that no matter how many times he pointed out that the 1963 decree was a minimum requirement imposed on the Barnes and not a maximum, "people have continually suggested that it was the maximum permitted, and that the Barnes has attempted to increase from its supposed maximum allowance." (*Id.*)

As an initial matter, Kelsen does not identify in his affidavit whom he spoke with, who kept disagreeing with him, or whether these individuals were the ones responsible for determining whether the Barnes had changed its use under the Zoning Ordinance. More importantly, Kelsen does not provide any information about what factors are relevant

under the Zoning Ordinance to determine whether the Barnes had changed its primary use, nor has the Barnes provided any such evidence elsewhere. Thus, the Barnes has given the trier of fact no basis by which to determine whether the question of the Barnes's "change of use" under the Zoning Ordinance is even related to, much less dictated by, the Barnes's compliance with the 1963 court decree. If the Barnes's compliance with the Township's Zoning Ordinance is not related to its compliance with the 1963 court decree, then the asserted disagreement between Kelsen and the Township "people" over the Barnes's compliance with the 1963 court decree is not probative of whether the Township's reasons for issuing a "change of use" zoning citation were pretextual. Accordingly, because this evidence is not relevant unless the two are related, and because the Barnes has not offered evidence sufficient to support a finding that they are related, this evidence would not be admissible at trial and may not be considered on a motion for summary judgment. *See* Fed.R.Evid. 104(b); Fed.R.Evid. 402; Fed.R.Civ.P. 56(e); *Philbin v. Trans Union Corp.,* 101 F.3d 957, 961 n. 1 (3d Cir.1996); *J.F. Feeser Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1542 (3d Cir.1990); *Christophersen v. Allied–Signal Corp.,* 939 F.2d 1106, 1109 & n. 2 (5th Cir.1991) (en banc) (per curiam).

Next, the Barnes contends that the Commissioners could not have been pursuing legitimate goals in litigating the December 1995 and August 1996 zoning citations because they were given weekly memoranda from the Township Manager that it claims demonstrated that the Barnes had not changed its use. The Barnes claims that these memoranda put the Board of Commissioners on notice that the level of the Barnes's visitation had not increased as compared to pre-renovation activities. (Doc. # 323, at 27, 53; SMF, ¶ 321.)

As evidence, the Barnes offers ten memoranda, with dates spanning from November 17, 1995 to March 29, 1996, addressed from Township Manager David Latshaw to the

---

47. Because I conclude that I cannot consider this portion of Kelsen's affidavit for purposes of summary judgment, I need not address the Township's and Commissioners' objections to the consideration of Kelsen's affidavit. (Doc. # 342, at 17–19, 28; Doc. # 343, at 19–20 & n. 6, 34, 36–43.)

President and Members of the Board of Commissioners, in which Latshaw provides weekly updates of significant events in the Township, including events involving the Barnes. (Pl.'s Ex. 223.) With the exception of the memoranda dated November 17 and November 22, 1995, however, Latshaw does not provide estimates of the level of the visitation experienced by the Barnes after its reopening or how that level compared to the level of visitation experienced before the renovations. For the week of November 17, 1995, Latshaw stated that the "anticipated large number of visitors did not materialize" on November 16, 1995, the Barnes's opening day, but that "no inference can be made from this small turn-out and the Police Department will continue to monitor the site during hours of operation for the next few weeks." (Pl.'s Ex. 223, at 122000.) For the week of November 22, 1995, Latshaw reported that the level of visitation for the opening weekend was "consistent with the visitations experienced prior to the closing of the Foundation for renovations" but that several parking citations were issued. (Pl.'s Ex. 223, at 122005.) For the remainder of the weeks, Latshaw does not discuss the level of visitation, but rather reports the number of parking citations issued, the number of citizen complaints received, and the level of police activity required, and he does not compare these latter circumstances to pre-renovation levels. Thus, aside from the opening week, Latshaw's memoranda do not provide information about how the Barnes's post-renovation activities compared to pre-renovation activities. Moreover, the Barnes has provided no evidence of what factors the Township relied on in determining that the Barnes had changed its primary use from an educational institution to a museum, or what factors would ordinarily be relevant to that determination, and thus the Barnes has not given the trier of fact any basis by which to assess whether Latshaw's weekly reports of parking citations and police activity should have put the Commissioners on notice that the Zoning Officer's citation was unfounded. Accordingly, this evidence does not create a genuine issue of material fact.

Finally, the Barnes contends that the Township's decision in August 1996 to withdraw its December 13, 1995 zoning citation, which mooted the Barnes's pending appeal, and to issue a new zoning citation the same day demonstrates that the zoning citations were baseless and designed to harass the Barnes. As evidence, the Barnes offers the affidavit of Peter F. Kelsen, Esquire, who states that "[t]he fact that the Township withdrew its own citation before its own Zoning Hearing Board after the conclusion of hearings and briefs is additional evidence that the original notice issued by the Township in December 1995, was baseless." (Pl.'s Ex. 11, ¶ 19.) Kelsen's statement is merely argument and does not set forth any specific fact. Accordingly, this evidence does not create a genuine issue of material fact. *See* Fed.R.Civ.P. 56(e); *Maldonado v. Ramirez*, 757 F.2d 48, 50–51 (3d Cir.1985).

Thus, in conclusion, the Barnes's evidence with respect to the zoning citations, as with its evidence concerning the parking lot, the building inspections, and the Reopening Gala Events, fails to show that it was treated differently or that any of the Defendants' conduct was motivated by a racially discriminatory purpose.

### *ORDER*

**AND NOW**, this 26th day of September, 1997, for the reasons stated in the attached memorandum and appendix, **IT IS ORDERED** as follows:

1. The Motion for Summary Judgment of the Township of Lower Merion (document # 288) is **GRANTED;** and

2. The Motion for Summary Judgment for the Commissioners of the Township of Lower Merion (document # 291) is **GRANTED.**